# EXHIBIT A

# STATE COURT OF COBB COUNTY
# STATE OF GEORGIA

CIVIL ACTION NUMBER  19-A-1716

$199.00 COST PAID

America 2030 Capital LLC, DBA America
2030

**PLAINTIFF**

**VS.**

SUNPOWER GROUP LIMITED
MIN, GE CUI
KAI, CHEN
NING, JIANG
PING SUM, LAU, AKA PIERCE
THE EDGE MEDIA GROUP PTE LTD
KOOI TONG, ONG
LEE, PC
ZHU, MICHELLE
DCP CAPITAL PARTNERS
LU, DAVID
CDH INVESTMENTS
YAN, HUANG
GANG, LI
WEI, YING
XIAOMING, SONG
NING, HU
LI, GUO
HSU, WILLIAM
UOB KAY HIAN PTE LTD
UNITED OVERSEAS BANK LIMITED

**DEFENDANTS**

# STATE COURT OF COBB COUNTY
## STATE OF GEORGIA

**SUMMONS**

TO THE ABOVE NAMED DEFENDANTS:

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Timothy Coen**

**1000 DAVIS DR**
**ATLANTA, Georgia 30327-4536**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 10th day of May, 2019.**

Clerk of State Court

Angie T. Davis, Clerk of State Court
Cobb County, Georgia

12 East Park Square, Marietta, Georgia 30090-9630
(770) 528-1220 Building B, First Floor-Civil Division

Page 2 of 2

📧 EFILED IN OFFICE
CLERK OF STATE COURT
COBB COUNTY, GEORGIA

**19-A-1716**

MAY 09, 2019 04:04 PM

*Angie J. Davis*
Angie T. Davis, Clerk of State Court
Cobb County, Georgia

IN THE STATE COURT OF COBB COUNTY
STATE OF GEORGIA

| | |
|---|---|
| America 2030 Capital LLC, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | )   Civil Action File No. _____ |
| | ) |
| Sunpower Group Limited | ) |
| Ge Cui Xin | ) |
| Chen Kai | ) |
| Jiang Ning | ) |
| Lau Ping Sum (Aka "Pearce") | ) |
| The Edge Media Group Pte Ltd | ) |
| Ong Kooi Tong | ) |
| PC Lee | ) |
| Michelle Zhu | ) |
| DCP Capital Partners | ) |
| David Lu | ) |
| CDH Investments | ) |
| Huang Yan | ) |
| Li Gang | ) |
| Ying Wei | ) |
| Song Xiaoming | ) |
| Hu Ning | ) |
| Guo Li | ) |
| William Hsu | ) |
| UOB Kay Hian Pte Ltd | ) |
| United Overseas Bank Limited, | ) |
| | ) |
| **Defendants,** | ) |

## VERIFIED COMPLAINT

COMES NOW, the Plaintiff AMERICA 2030 CAPITAL LLC (hereinafter known as "Plaintiff") by and through the undersigned attorney, files this First Verified Complaint for tortious damages caused by the above-referenced defendants (hereinafter known as "Defendants") due the Defendants' acts of Defamation per se, Intentional Infliction of Emotional Distress, False Light Invasion of Privacy, Tortious Interference with Contractual Relations, Tortious Interference with

1

Future Business Relations, Unfair Business Practices, Negligence, Negligent Infliction of Emotional Distress, and Fraud. Further, Plaintiff claims that Defendants have acted in whole or in part via a concerted action and/or conspiracy to commit the foregoing tortious acts against Plaintiff. In furtherance, the Plaintiffs hereby state as follows:

## I.   JURISDICTION AND VENUE

1. Plaintiff AMERICA 2030 CAPITAL LLC is a Georgia limited liability company whose principal place of business is located in Kennesaw, Cobb County, Georgia, United States.

2. SUNPOWER GROUP LIMITED is a publicly traded company in Singapore with a principal place of business listed as Nanjing Jiangning Science Park No.2111 Chengxin Road Nanjing, 211112 China.

3. Defendant SUNPOWER GROUP LIMITED is a nonresident company that transacts business within this state and that regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

4. Further, Defendant SUNPOWER GROUP LIMITED has purposefully directed conduct toward Georgia, and has a sufficient level of contact with this state that it is reasonable for Defendant to anticipate being sued in the State of Georgia.

5. Defendant GE CUI XIN's domicile is China.

6. Defendant CHEN KAI's domicile is China.

7. Defendant JIANG NING's domicile is China.

8. Defendant LAU PING SUM (AKA "PEARCE")'s domicile is China.

9. Each of Defendants GE CUI XIN, CHEN KAI, JIANG NING and LAU PING SUM is a corporate officer and/or a director of SUNPOWER GROUP LIMITED (the "SunPower Group

2

Officials") at the time of the commission of the torts that are the subject of this Complaint. As such, each of the SunPower Group `Officials is a nonresident who, in person:

(1) Transacts business within this state;

(2) Committed a tortious act or omission within this state; and/or

(3) Committed a tortious injury in this state by an act or omission outside this state and is a tortfeasor who regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

10. As such, under O.C.G.A. §9-10-91 each of the SunPower Group Officials, as a nonresident, is subject to the jurisdiction of this Court as to the cause of action set forth in the Complaint arising from his acts or omissions in the same manner as if he were a resident of the state, and may be served with the Summons and Complaint by delivery of process to him at his domicile or at the offices of SUNPOWER GROUP LIMITED at Nanjing Jiangning Science Park No.2111 Chengxin Road Nanjing, 211112 China.

11. Defendant THE EDGE MEDIA GROUP PTE LTD is a media company in Singapore with a principal place of business listed as 150 Cecil Street #13-00, Singapore 069543.

12. Defendant THE EDGE MEDIA GROUP PTE LTD is a nonresident company that transacts business within this state and that regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

13. Further, Defendant THE EDGE MEDIA GROUP PTE LTD has purposefully directed conduct toward Georgia, and has a sufficient level of contact with this state that it is reasonable for Defendant to anticipate being sued in the State of Georgia.

3

14. Defendant ONG KOOI TONG's domicile is Singapore.

15. Defendant PC LEE's domicile is Singapore.

16. Defendant MICHELLE ZHU's domicile is Singapore.

17. Each of Defendants ONG KOOI TONG, PC LEE and MICHELLE ZHU is a corporate officer and/or a director, agent or employee of THE EDGE MEDIA GROUP PTE LTD (the "Edge Media Officials") at the time of the commission of the torts that are the subject of this Complaint. As such, each of the Edge Media Officials is a nonresident who, in person:

   (1) Transacts business within this state;

   (2) Committed a tortious act or omission within this state; and/or

   (3) Committed a tortious injury in this state by an act or omission outside this state and is a tortfeasor who regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

18. As such, under O.C.G.A. §9-10-91 each of the Edge Media Officials, as a nonresident, is subject to the jurisdiction of this Court as to the cause of action set forth in the Complaint arising from his acts or omissions in the same manner as if he were a resident of the state, and may be served with the Summons and Complaint by delivery of process to him at his domicile or at the offices of THE EDGE MEDIA GROUP PTE LTD at 150 Cecil Street #13-00, Singapore 069543.

19. Defendant DCP CAPITAL PARTNERS is a private equity firm with a principal place of business listed as, Unit 1425, 14th Floor, China World Office 1,1 Jianguomenwai Avenue, Chaoyang District, Beijing, 100004, China.

20. Defendant DCP CAPITAL PARTNERS is a nonresident company that transacts business

4

within this state and that regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

21. Further, Defendant DCP CAPITAL PARTNERS has purposefully directed conduct toward Georgia, and has a sufficient level of contact with this state that it is reasonable for Defendant to anticipate being sued in the State of Georgia.

22. Defendant DAVID LU's domicile is China.

23. Defendant DAVID LU is a corporate officer and/or a director of DCP CAPITAL PARTNERS at the time of the commission of the torts that are the subject of this Complaint. As such, DAVID LU is a nonresident who, in person:

   (1)  Transacts business within this state;

   (2)  Committed a tortious act or omission within this state; and/or

   (3)  Committed a tortious injury in this state by an act or omission outside this state and is a tortfeasor who regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

24. As such, under O.C.G.A. §9-10-91 DAVID LU, as a nonresident, is subject to the jurisdiction of this Court as to the cause of action set forth in the Complaint arising from his acts or omissions in the same manner as if he were a resident of the state, and may be served with the Summons and Complaint by delivery of process to him at his domicile or at the offices of DCP CAPITAL PARTNERS at Unit 1425, 14th Floor, China World Office 1,1 Jianguomenwai Avenue, Chaoyang District, Beijing, 100004, China.

5

25. Defendant CDH INVESTMENTS is a publicly traded entity with a principal place of business listed as One Temasek Avenue, #18-02, Millenia Tower, Singapore.

26. Defendant HUANG YAN's domicile is Singapore.

27. Defendant LI GANG's domicile is Singapore.

28. Defendant YING WEI's domicile is Singapore.

29. Defendant SONG XIAOMING's domicile is Singapore.

30. Defendant HU NING's domicile is Singapore.

31. Defendant GUO LI's domicile is Singapore.

32. Defendant WILLIAM HSU's domicile Singapore.

33. Each of Defendants HUANG YAN, LI GANG, YING WEI, SONG XIAOMING, HU NING, GUO LI and WILLIAM HSU is a corporate officer and/or a director of CDH INVESTMENTS (the "CDH Officials") at the time of the commission of the torts that are the subject of this Complaint. As such, each of the CDH Officials is a nonresident who, in person:

   (1)  Transacts business within this state;

   (2)  Committed a tortious act or omission within this state; and/or

   (3)  Committed a tortious injury in this state by an act or omission outside this state and is a tortfeasor who regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

34. As such, under O.C.G.A. §9-10-91 each of the CDH Officials, as a nonresident, is subject to the jurisdiction of this Court as to the cause of action set forth in the Complaint arising from his acts or omissions in the same manner as if he were a resident of the state, and may be served

with the Summons and Complaint by delivery of process to him at his domicile or at the offices of CDH INVESTMENTS at One Temasek Avenue, #18-02, Millenia Tower, Singapore.

35. Defendant UOB KAY HIAN PTE LTD is a publicly traded entity with a principal place of business listed as Robinson Road, P.O Box 1688, Singapore 903338

36. Defendant UOB KAY HIAN PTE LTD is a nonresident company that transacts business within this state and that regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

37. Further, Defendant UOB KAY HIAN PTE LTD has purposefully directed conduct toward Georgia, and has a sufficient level of contact with this state that it is reasonable for Defendant to anticipate being sued in the State of Georgia.

38. Defendant UNITED OVERSEAS BANK LIMITED is a publicly traded entity with a principal place of business listed as 80 Raffles Place, UOB Plaza, Singapore 048624.

39. Defendant UNITED OVERSEAS BANK LIMITED is a nonresident company that transacts business within this state and that regularly does or solicits business, or engages in another persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state.

40. Further, Defendant UNITED OVERSEAS BANK LIMITED has purposefully directed conduct toward Georgia, and has a sufficient level of contact with this state that it is reasonable for Defendant to anticipate being sued in the State of Georgia.

41. Further, Plaintiff avers that jurisdiction is proper here based on the fact that the harm occurred to a Plaintiff, which is a Corporation in good standing whose principal office is located in Kennesaw, Cobb County, Georgia, United States.

## II.    BACKGROUND FACTS

42. Plaintiff repeats and incorporates the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

43. Plaintiff is part of a global consortium of mergers and acquisitions companies, in which one specialty includes securities lending.

44. At all times material and relevant hereto, Defendants have advanced and willfully, deliberately, with malicious intent participated in a well-organized plan to defame and harm, Plaintiffs reputation.

45. Plaintiffs maintain that at all times during these acts, Plaintiff or its affiliates have a valid and binding Master Loan Agreement, Custodian Management Agreement, and Power of Attorney that allow for the transfer of shares under the agreements with Tournan Trading PTE LTD & Sunpower Business Group PTE LTD, copies of which are attached as Exhibits A and B.

46. On or about June 12, 2018 Plaintiff or its affiliates through the consortium and Tournan Trading PTE LTD entered into a Master Loan Agreement, Power of Attorney, and a Custodian Management Agreement with regards to shares owned in Defendant SUNPOWER GROUP LIMITED, copies of which are attached as Exhibit A.

47. On or about June 12, 2018 Plaintiff or its affiliates through the consortium and Sunpower Business Group PTE LTD entered into a Master Loan Agreement, Power of Attorney, and a Custodian Management Agreement with regards to shares owned in Defendant SUNPOWER GROUP LIMITED, copies of which are attached as Exhibit B.

8

48. The Master Loan Agreements, Powers of Attorney, and a Custodian Management Agreements as mentioned above and attached hereto as Exhibit A and Exhibit B; call for the forfeiture of any shares held by Plaintiff or its affiliates in the event of default of the Master Loan Agreement.

49. Plaintiff or its affiliates through the consortium and Tournan Trading PTE LTD entered into a Master Loan Agreement, Power of Attorney, and a Custodian Management Agreement with regards to shares owned in Defendant SUNPOWER GROUP LIMITED, which allows for the following rights:

   a. Plaintiff or its affiliates may sell the Pledged Collateral if, in Plaintiff or its affiliates' sole discretion, a foreseeable adverse material event would require it to do so;

   b. Whether as a result of Tournan Trading PTE LTD default or otherwise, Plaintiff or its affiliates is authorized to convert the Pledged Collateral to protect Plaintiff or its affiliates' interest and induce Plaintiff or its affiliates to provide financing;

   c. Plaintiff or its affiliates may transact at any time in the Pledged Collateral and may do so in order to fund the loan;

   d. Plaintiff or its affiliates may exercise dominion over the Pledged Collateral in accordance with the MLA; and

   e. The Borrower concedes to Plaintiff or its affiliates the right to transact in the Pledged Collateral.

50. Plaintiff or its affiliates through the consortium and Sunpower Business Group PTE LTD entered into a Master Loan Agreement, Power of Attorney, and a Custodian Management Agreement with regards to shares owned in Defendant SUNPOWER GROUP LIMITED, which allows for the following rights:

9

a.  Plaintiff or its affiliates may sell the Pledged Collateral if, in Plaintiff or its affiliates' sole discretion, a foreseeable adverse material event would require it to do so;

b.  Whether as a result of Sunpower Business Group PTE LTD default or otherwise, Plaintiff or its affiliates is authorized to convert the Pledged Collateral to protect Plaintiff or its affiliates' interest and induce Plaintiff or its affiliates to provide financing;

c.  Plaintiff or its affiliates may transact at any time in the Pledged Collateral and may do so in order to fund the loan;

d.  Plaintiff or its affiliates may exercise dominion over the Pledged Collateral in accordance with the MLA; and

e.  The Borrower concedes to Plaintiff or its affiliates the right to transact in the Pledged Collateral.

51. Further, the Master Loan Agreements, Powers of Attorney, and a Custodian Management Agreements as mentioned above and attached hereto as Exhibit A and Exhibit B; state that any dispute amongst the parties must be arbitrated before an arbitration panel in St. Kitts and Nevis.

52. On or about November 9, 2018, Tournan Trading PTE LTD and Sunpower Business Group PTE LTD were sent formal notices of forfeiture due to default under the Master Loan Agreements, Powers of Attorney, and a Custodian Management Agreements, copies of which are attached as Exhibit C.

53. Tournan Trading PTE LTD and Sunpower Business Group PTE LTD failed to remedy the default under the Master Loan Agreement, therefore Plaintiff or its affiliates initiated arbitration actions against Tournan Trading PTE LTD and Sunpower Business Group PTE

10

LTD as per the Master Loan Agreement on or about November 27, 2018, copies of which are attached as Exhibit D.

54. On or about November 8, 2018, Defendants submitted a filing with the Singapore Securities Exchange (hereinafter known as "SGX"). This filing states in bold font **"UNAUTHORISED TRANSFERS OF SHARES IN RELATION TO THE LOAN AGREEMENT ENTERED INTO BETWEEN TWO SUBSTANTIAL SHAREHOLDERS OF THE COMPANY AND AMERICA 2030 CAPITAL LIMITED,"** a copy of which is attached as Exhibit E.

55. On or about November 20, 2018, Defendants submitted a filing with the Singapore Securities Exchange (hereinafter known as "SGX"). This filing states "The Group is not in breach of any of the Group's loan provisions in view of the unauthorised transfers of shares in relation to the America 2030 Loan Agreement," a copy of which is attached as Exhibit F.

56. On or about November 9, 2018, Defendants by and through the news publication "The Edge Singapore" told the press that there was an "illegal transfer" of shares. The news publication published the following headline in bold font **"Sunpower says illegal transfer out of 28 mil shares reason for trading halt,"** a copy of which is attached as Exhibit G.

57. On or about December 5, 2018, Defendants by and through the news publication "The Edge Singapore" released the following headline in bold font **"Sunpower executives involved in illegal transfer of shares lodge report with CAD."** The article further states "Sunpower Group's executive chairman Guo Hongxing and executive director Ma Ming have approached and lodged a report with the Commercial Affairs Department (CAD) and issued a press release regarding their involvement with the *illegal transfer* of 28 million shares in the group," a copy of which is attached as Exhibit H.

11

**58.** On or about January 10, 2019, Defendants published the following statements in bold font, **"Sunpower's 32% share price correction since its substantial shareholders fell prey to unauthorised share transfers on 17 Oct 18 appears to be overdone. Total exposure is limited to only 3.8% of issued shares; downside is limited as legal actions have been taken against their borrower and Sunpower has started buying back shares in 2019,"** a copy of which is attached as Exhibit I.

### III.    FIRST CLAIM FOR RELIEF
### TRADE NAME DISPARAGEMENT

59. Plaintiff repeats and incorporates the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

60. Trade Name Disparagement is an injurious falsehood, commercial disparagement, and slander of a business. It occurs when someone intentionally makes false and disparaging statements about a business. See *Diedrich v. Miller & Meier,* etc., 254 Ga. 734(2), 334 S.E.2d 308 (1985).

61. By using injurious language such as "Illegal," "Unauthorized," and "Fell Prey;" Defendants are purposefully attempting to harm Plaintiffs business as vindication and retaliation for the defaults on Tournan Trading PTE LTD and Sunpower Business Group PTE LTD. No court of law or authority has deemed any transaction between Defendants, Tournan Trading PTE LTD and Sunpower Business Group PTE LTD to be "Illegal" or "Unauthorized."

62. Defendants have disparaged Plaintiff's trade name without any privilege or conditional privilege to do so.

### IV.  SECOND CLAIM FOR RELIEF
### BUSINESS DISPARAGEMENT

63. Plaintiff repeats and incorporates the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

12

64. Business disparagement is the publication of derogatory and false statements and information about a person's title to his or her property, his or her business in general, or anything else made with the purpose of discouraging people from dealing with such individual or business.

65. Defendants published false statements against Plaintiff, as illustrated above, which used words such as "Illegal," "Unauthorized," and "Fell Prey."

66. (2) Defendants intended such published statements to cause financial harm to the Plaintiffs or reasonably believed that the publication would result in financial loss for the business of Plaintiff.

67. (3) Plaintiff and its affiliates have sustained financial loss in excess of $100,000,000.00 USD in business due to the false statements by Defendants.

68. Defendants acted with malice to assassinate Plaintiffs' character as a business.

## V.    THIRD CLAIM FOR RELIEF

## DEFAMATION

69. Plaintiff repeats and incorporates the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

70. The Statements made by Defendants as described above (the "Defamatory Statements") were, and continue to be, published to third parties.

71. The Defamatory Statements are false and malicious.

72. The Defamatory Statements were, and continue to be, made negligently and/or with actual malice.

73. The Defamatory Statements tend to injure the Plaintiff's and its affiliates' reputations and expose them to public hate, contempt, and/or ridicule.

74. The Defamatory Statements were, and continue to be, made in reference to Plaintiff's and its affiliates' business, trade, occupation and/or profession.

75. The Defamatory Statements tend to injure Plaintiff's and its affiliates' in their business, trade, office, occupation, and/or profession.

76. Plaintiff is a private figure, and the Defamatory Statements are not subject to any statutory or constitutional privilege under the law. Even if a privilege would otherwise apply, Defendants maliciously used such privilege within the meaning of O.C.G.A. § 51-5-9.

77. The Defamatory Statements constitute libel *per se* under the law, according to their plain import and/or by innuendo.

78. Defendants are joint or joint and several tortfeasors, obligors, joint contractors or copartners as to the libelous Defamatory Statements made and published by Defendants.

79. The corporate or company Defendants are also liable to Plaintiffs for the libelous Defamatory Statements made and published by their employees or agents under the principles of respondeat superior. As a direct and proximate result of the libelous Defamatory Statements, Plaintiffs have also suffered actual and presumed damages for which Defendants are liable in an amount to be shown at trial.

## VI.   FOURTH CLAIM FOR RELIEF

### UNFAIR BUSINESS PRACTICES

80. Plaintiffs repeat and incorporate the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

81. Defendants engaged in an unfair or deceptive trade practice.

82. Defendant's unfair or deceptive trade practices occurred in the course of Defendant's business, vocation, or occupation.

14

83. Defendant's unfair or deceptive trade practices significantly impact the public as actual or potential consumers of the Defendant's goods, services, or property.

84. Plaintiff suffered injury in fact to a legally protected interest as a result of Defendant's unfair or deceptive trade practices.

85. Defendants as public and media companies are held to a higher standard; however, they deceived the world with unfair statements that have irreparably harmed the Plaintiffs' reputations.

86. Defendants are in the normal course of issuing press releases and articles that are deemed newsworthy.

87. Defendants decided to attack Plaintiff in media opposed to in arbitration by releasing false and untruthful statements and it is unfair and deceptive for Defendants to conduct business or resolve disputes through the public media.

## VII.   FIFTH CLAIM FOR RELIEF

### FALSE LIGHT INVASION OF PRIVACY

88. Plaintiff repeats and incorporates the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

89. In the alternative along with the Claims of Relief listed above dealing with defamation and its related causes of action, Plaintiff alleges False Light Invasion of Privacy.

90. The Defamatory Statements and other information published by Defendants portray the Plaintiff in a false or misleading light.

91. The Defamatory Statements and other information published by Defendants is highly offensive or embarrassing to a reasonable person of ordinary sensibilities.

92. Defendants have published the Defamatory Statements and other information with reckless disregard as to its offensiveness.

## VIII.   SIXTH CLAIM FOR RELIEF

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

93. Plaintiff repeats and incorporates the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

94. Defendants through their intentional acts have caused multiple breaches of contract with Plaintiffs contractual relationships with parties outside of this action.

95. Defendants had actual knowledge of contractual relationships with Sunpower Business Group PTE LTD & Tournan Trading PTE LTD. and other parties not included in this action.

## IX.      SEVENTH CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

96. Plaintiff repeats and incorporates the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

97. Defendants Statements and actions, taken as a whole and in context, were both extreme and outrageous and beyond that which a reasonable person could be expected to endure.

98.     Defendants' Statements and actions, taken as a whole and in context, were malicious and intended to inflict emotional distress and did in fact result in such distress.

99.     Defendants are thus liable for intentional infliction of emotional distress.

## X.      EIGHTH CLAIM FOR RELIEF

## FRAUD

100.    Plaintiff repeats and incorporates the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

16

101.   Each of the Defendants that entered into the Master Loan Agreement, Power of Attorney, and a Custodian Management Agreement with regards to shares owned in such Defendant entered into such transactions fraudulently, with no present intention to perform the same.

102.   Defendants are thus liable for Fraud.

## XI.   NINTH CLAIM FOR RELIEF

### PUNITIVE DAMAGES

103.   Plaintiff repeats and incorporates the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

104.   The Defamatory Statements were made with the specific intent to cause harm to Plaintiff.

105.   In making the Defamatory Statements, Defendants and/or their servants, agents and/or employees showed willful misconduct, malice, fraud, wantonness, oppression, and/or that entire want of care which would raise the presumption of conscious indifference to consequences.

106.   Defendants are liable to Plaintiff for punitive damages sufficient to penalize or punish them for publishing the Defamatory Statements and to deter them from engaging in such conduct in the future.

## XII.   TENTH CLAIM FOR RELIEF

### ATTORNEYS FEES

107.   Plaintiff repeats and incorporates the foregoing Paragraphs of this Civil Action Verified Complaint as if they were printed verbatim herein below.

108.   Defendants and their servants, agents and/or employees have acted in bad faith, have been stubbornly litigious and/or have caused Plaintiffs unnecessary trouble and expense such that

17

Plaintiffs are entitled to a judgment against Defendants for Plaintiffs' attorneys' fees and expenses of litigation in an amount to be shown at trial.

WHEREFORE, Plaintiff hereby respectfully prays:

1. that process and summons issue and that Defendants be served with this Complaint as provided by law;

2. that judgment be entered in favor of Plaintiffs and against Defendants under Count III First Claim for Relief of this Complaint;

3. that judgment be entered in favor of Plaintiffs and against Defendants under Count IV Second Claim for Relief of this Complaint;

4. that judgment be entered in favor of Plaintiffs and against Defendants under Count V Third Claim for Relief of this Complaint;

5. that judgment be entered in favor of Plaintiffs and against Defendants under Count VI Fourth Claim for Relief of this Complaint;

6. that judgment be entered in favor of Plaintiffs and against Defendants under Count VII Fifth Claim for Relief of this Complaint;

7. that judgment be entered in favor of Plaintiffs and against Defendants under Count VIII Sixth Claim for Relief of this Complaint;

8. that judgment be entered in favor of Plaintiffs and against Defendants under Count IX Seventh Claim for Relief of this Complaint;

9. that judgment be entered in favor of Plaintiffs and against Defendants under Count X Eighth Claim for Relief of this Complaint;

10. that judgment be entered in favor of Plaintiffs and against Defendants under Count XI Ninth Claim for Relief of this Complaint;

11. that judgment be entered in favor of Plaintiffs and against Defendants under Count XII Tenth Claim for Relief of this Complaint;

12. that judgment be entered in favor of Plaintiff and against Defendants for all pre- and post-judgment interest as permitted by law;

13. that Plaintiff be granted a TRIAL BY JURY on their claims in this action; and that Plaintiff be awarded such other and further relief as this Court deems just and proper.

Respectfully submitted, this 8th day of May, 2019.

TFCOEN LAW FIRM LLC,
*Counsel for Plaintiff*

*/s/ Timothy F. Coen*
TIMOTHY F. COEN
GBN 172875

1000 Davis Drive
Atlanta, Georgia 30327
Phone: (404) 545-6886
Email:  skc_tfc@bellsouth.net

19

STATE OF GEORGIA,

COUNTY OF COBB.

## VERIFICATION

Before the undersigned officer duly authorized by law to administer oaths personally appeared Val Sklarov, who, after being first sworn, deposed and under oath stated that, based on his personal knowledge, the facts and all Exhibits set out in the within and foregoing VERIFIED COMPLAINT are true, correct and complete.

By: _____

Val Sklarov

(SEAL)

Sworn to and subscribed before me

this _8th_ day of May, 2019.

By: _____

Notary Public

My Commission Expires: _4-11-21_

Jamie L. Olson
Notary Public, Paulding County, Georgia
My Comm. Expires 04/11/2021

# EXHIBIT A

## MASTER LOAN AGREEMENT

This Master Loan Agreement supersedes all pervious term sheets and discussions and is the final documentation of the Parties' undertakings which is entered into and effective on the date of mutual execution hereof by and between:

TOURNAN TRADING PTE LTD for itself, representatives, affiliates, and assigns, with a principal place of business located at 55 Lorong L Telok Kurau, #3-63 Bright Centre, Singapore 425500, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("Borrower");

AND

AMERICA 2030 CAPITAL LIMITED, for itself, representatives, affiliates, and assigns, with an office located at Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central, Sheung Wan, Hong Kong, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("Lender").

Borrower and Lender are hereinafter sometimes individually referred to as a "Party" and collectively as the "Parties".

## SECTION 1

## DEFINITIONS

1.1     Defined Terms. As used in this Agreement and any other agreement(s) entered into by the Parties, the following terms shall have the following meanings:

"Agreement" shall mean this Master Loan Agreement, including any Exhibits or Schedules hereto, and as amended or supplemented from time to time, or as incorporated by reference into subsequent agreements.

"Approved Loan Amount" is the amount that Lender, subject to market conditions and Lender's discretion, is willing to fund the Loan up to.

"Business Day" shall mean the working day of a calendar week, except Saturday, Sunday and public holidays in accordance with relevant applicable laws – Hong Kong & Singapore

"Breach" shall mean any of the Events of Default specified in this Agreement and other Loan Documents that constitute a default unless specified otherwise.

"Closing Date" shall mean the day in which the Pledged Collateral has been delivered to and confirmed by the Depository Broker.

"Closing Statement" shall mean a statement in the form attached to this Agreement as Exhibit I, which Closing Statement shall be delivered by Lender to Borrower following the delivery of the Pledged Collateral to the Depository Broker.

"Currency" the Loan and all interest and fees shall be in United States of American Dollars ("USD"). If the Pledged Collateral is a security which is priced and traded in a market and currency other than USD, the Parties agree to convert to USD for all purposes.

"Default" shall mean any of the Events of Default specified in this Agreement and other Loan Documents.

"Depository Account" or "Account" shall mean the account(s) established pursuant to this Agreement and other Loan Documents for the receipt and possession of the Pledged Collateral.

"Depository Broker" shall mean the financial institution selected by Lender for the receipt of the Pledged Collateral and any top-up.

"Event of Default" shall mean any of the events specified in Section 7.1 hereof.

"Fair Market Price" ("FMP") shall mean with respect to the stock or securities provided as Pledged Collateral the average of the last sale price on three (3) consecutive Business Days prior to closing. That average price shall be the per-share price of the Pledged Collateral used to establish its fair market value ("FMV").

"FMV" shall mean the amount, expressed in US dollars, equating to the FMP for each share of the Pledged Collateral multiplied by the number of such shares comprising the Pledged Collateral.

"Issuer" shall mean the corporate entity that has distributed shares of SUNPOWER GROUP LTD (SPWG:SP).

"Lender's Remedy" shall mean termination of the Loan and forfeiture of the Pledged Collateral is accordance with Section 7.2 *infra*.

"Lien" shall mean, with respect to any asset, any mortgage, lien, pledge, charge, security interest, or encumbrance of any kind in respect of such asset.

"Loan" shall mean the total contractual gross amount lent to Borrower by Lender on a nonrecourse basis for the specified term and subject to the stated conditions.

"Loan Documents" shall mean collectively, this Agreement, the Power of Attorney, the Closing Statement, and any other agreements, documents, instruments, exhibits, or statements delivered in connection with the Loan. Each to be read and construed together in a manner so as to give meaning and effect to all their provisions.

"Material Event" is such that is individually exemplified in Section 5.2.

"Maturity Date" shall have the meaning provided in Section 2.6(a).

"Party" shall mean Lender or Borrower, as the case may be, and their agents, representatives, successors, affiliates, and assigns.

"Proof of Funds" shall mean cash or liquid securities.

"Term of the Loan" shall mean when the Loan starts as defined by Verification Day and ends as defined by Maturity Date.

"Pledged Collateral" shall mean the actual shares delivered to Lender as a consideration for the Loan and any shares or proceeds resulting from any transaction, split-up, revision, reclassification, or other like change of the Pledged Collateral.

"Valuation Event" shall mean that the FMP of the Pledged Collateral has fallen to less than seventy five percent (75%) of the FMP used to calculate the Approved Loan Amount as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange.

"Verification Day" shall mean the Business Day after the Pledged Collateral has been received and posted to Lender's account prior to Closing Date.

1.2     Use of Defined Terms. All terms defined in this Agreement shall have such defined meanings when used herein and in any other Loan Documents made or delivered in conjunction with this Loan transaction.

1.3     Lender's Discretion. Lender has the discretion and right to elect to not proceed with this Agreement at any time up until the Closing Date.

1.4     Statements as to Knowledge. Any statements, representations, or warranties which are based upon the knowledge of Borrower shall be deemed to have been made after due inquiry with respect to the matter in question but without Borrower being required to seek an opinion of counsel with respect thereto.

## SECTION 2
## MATERIAL TERMS OF THE LOAN

2.1     Approved Loan Amount.

(a)     Subject to all of the terms and conditions of this Agreement, Lender agrees to lend to Borrower funds equal to up to Twenty Five Million ($25,000,000.00) USD of the current FMV of the Pledged Collateral. The Approved Loan Amount shall typically be funded within three (3) Business Days of the receipt by Lender of a confirmation that the Pledged Collateral has been deposited with the Depository

broker and shall be memorialized in a Closing Statement as example in the form of Exhibit 1 hereto, which is hereby incorporated by reference.

(b)     Where the Loan is repaid in full at maturity, Borrower shall be entitled to all of the appreciation in the FMV of the Collateral, if any.

(c)     For purposes of Section 2.1(e), the amount that Lender may make available under the Loan shall be calculated by multiplying (i) fifty-five percent (55%) of the Pledged Collateral by (ii) the FMV.

(d)     Lender reserves the right not to fund the Loan at any one time more than four and nine tenths of one percent (4.9%) of the total shares outstanding.

## 2.2     Interest Rate.

(a)     All outstanding amounts of the Loan shall bear an interest rate in an amount equal to three and four point nine tenths percent (3.49%) per year to be paid to Lender in quarterly installments and on the Maturity Date. Interest payment shall be collected in advance of the Loan and shall accrue daily both before and after any Event of Default, demand, court judgment, or arbitral award, and shall be calculated on the basis of the actual number of days elapsed and on the basis of a year of three hundred and sixty five (365) days (three hundred and sixty six (366) days in a leap year).

(b)     The first interest payment date for the Loan shall be due on the first Business Day of the third month following the applicable Closing Date and such payment shall be based on a quarter year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due. All subsequent payments (except otherwise noted herein) shall be due on the first Working Day of each third month thereafter for the Term defined in Section 2.5 (as such Term may be extended) until the Maturity Date.

(c)     Subject to Section 2.1, all interests due hereunder shall be paid in or its value determined in U.S. dollars and made by way of certified check, wire transfer or other immediately available funds as directed by Lender.

2.3     Prepayment. There shall be no prepayment ("Prepayment") of the Approved Loan Amount or of any interest due under the Loan permitted during the first twelve (12) months of the Term, except any

payments to be received pursuant to a Change in Collateral event. Borrower may prepay the Approved Loan Amount after the lock-up period of 1 year, but shall be subject to a two percent (2%) prepayment fee.

**2.4  Fees.**

(a)  **Loan Origination Fee.** Contemporaneous with the funding of the Loan by Lender, Borrower shall pay to Lender an agreed upon Loan origination fee ("Lender's Origination Fee") of three tenths percent (3%) of the Approved Loan Amount actually funded. Lender is authorized to automatically deduct such Origination Fee.

(b)  **Loan Maintenance Fee.** Borrower shall pay to Lender an annual maintenance fee ("Lender's Maintenance Fee") of five tenths percent (0.5%) of the Approved Loan Amount. Lender is authorized to deduct in advance the Maintenance Fee from the Approved Loan Amount for the first year and the same shall be paid by Borrower on each anniversary of the Loan thereafter for all the years constituting the Term of the Loan.

(c)  **Third Party Expenses.** Borrower agrees to bear all reasonable costs, fees, and out of pocket expenses that might arise in the course of enforcing, executing, and maintaining this Agreement. For the services provided, the Depository Broker will be entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s). For the avoidance of doubt, the annual custodian management charge is exclusive of any transaction fee, personal income tax, and other administrative costs and fees. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year fee is deducted from the Loan proceeds.

(d)  **Break-Up Fee.** In the event that Borrower fails to deliver the Pledged Collateral after execution of this Agreement, then there shall be a Break-Up Fee equal to five percent (5%) of the FMV of the Approved Loan Amount. The Break-Up Fee, also known as Liquidated Damages Fee or Rescission Fee, is effective upon the due execution of this Agreement by both Parties, and shall be Lender's only claim against Borrower for damages as a result of Borrower's failure to deliver the Pledged Collateral to the Depository Broker. This five percent (5%) Break-Up Fee applies only to Borrower's failure to deliver the Pledged Collateral and does not apply to other Event(s) of Default, which are covered under Section 7 of this Agreement.

(e)     Other Fees. Borrower shall pay for third party legal expenses and opinions to validate the stock legitimacy and transferability as well as costs associated with the transfer, if any.

2.5     Extra Loan Amount. In the event of an increase in the FMV of the Pledged Collateral, Borrower has the right to request that Lender increase the Approved Loan Amount at the same Loan to Value (LTV) as provided herein, at which time an amendment to this Agreement regarding additional funds to be provided will be incorporated. Lender will have sole discretion in determining whether to fund any additional funds in addition to the Approved Loan Amount, up to the full FMV of the Pledged Collateral at the time of the written request. Borrower may exercise this provision no more than once every six (6) months.

2.6     Term of the Loan and Maturity Date of Loan.

(a)     The Loan shall mature, and the Approved Loan Amount together with all accrued interest thereon shall be due and payable, three (3) years subsequent to the occurrence of the Closing Date (the "Maturity Date" or "Maturity").

(b)     The Maturity Date may be extended by the Lender if agreed to by the Lender in writing. A fee in the amount of two percent (2%) of the Approved Loan Amount (the "Extension Fee") shall be due and payable on the original Maturity Date if the Lender agrees to extend such Maturity Date at the prevailing annual interest rate at the time of extension.

(c)     No later than sixty (60) calendar days prior to the Maturity Date, Borrower shall communicate to Lender in writing whether it intends to repay the Approved Loan Amount on the Maturity Date. No later than thirty (30) calendar days prior to the Maturity Date, Borrower shall provide proof of funds to repay the Approved Loan Amount plus any other obligations due to Lender (as detailed in Section 2.9) on the Maturity Date (the "Proof of Funds"). The provision of proof of funds can be a screenshot of Borrower's bank or securities account holdings, or a copy of bank or securities account statement sent to the Lender via email.

2.7     Closing. The Closing Date shall be no later than three (3) Business Days after the Verification Day, assuming the conditions to Lender's obligations set forth in Section 6 herein are satisfied. The balance payment ("Balance Payment") shall be paid within three (3) Business Days of the written receipt by Lender of a confirmation that the Pledged Collateral has been deposited with the Depository

Broker. The Balance Payment shall mean the Approved Loan Amount less any Origination Fee, costs, or expenses, if applicable and as set forth in the Closing Statement, not satisfied in cash by Borrower. The Balance Payment shall be settled (paid) to the account(s) designated by the Borrower per the following instructions:

| Bank/Institution Name | UBS AG, Singapore |
|---|---|
| Swift Code No/Routing Number | UBSWSGSG |
| Account Number | 0546-0086 5330 |
| Account Name | MA MING |
| Address of Account | one Raffles Quy # 50-01 North Tower Singapore 048583 |

2.8   **Payment of the Approved Loan Amount and Interest on Maturity Date.** Repayment of the Approved Loan Amount plus any other obligations due to Lender, including but not limited to interest due on the Approved Loan Amount, shall be made on the Maturity Date. If the overdue Approved Loan Amount and other obligations are not received by Lender within three (3) Business Days of the original due date, Lender will send a notice to Borrower advising Borrower that the Loan will terminate under the default provisions of this Agreement.

2.9   **Loan Termination and Redelivery of the Pledged Collateral.** This Agreement shall terminate when all of Borrower's obligations have been paid in full. Lender confirms and will maintain its full ability to return the Pledged Collateral, and all rights, benefits and interests in relation thereto ("Sunpower shares") at the FMP, to Borrower, free of any encumbrance within five (5) Business Days of Borrower's satisfaction of its obligations. Provided, however, that this Agreement shall be reinstated if any payment in respect of the obligations is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by Lender for any reason. For the purpose of this Agreement, a return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, reclassification, or other like change of the Pledged Collateral. Any cash or shares tendered to buy down the Loan as a result of a Valuation Event are subject to redelivery and shall become part of the Pledged Collateral. Lender confirms to return only Sunpower shares, and not shares of other companies nor cash nor other equivalents.

## SECTION 3

### NATURE OF LOAN AND THE PLEDGED COLLATERAL

3.1 Non-Recourse Loan. Lender agrees that it will at all times look only to the Pledged Collateral identified in this Agreement for payment of the obligations and will not make any claim or institute any action or proceeding against Borrower or any representatives, agents, successors, assigns, or affiliates of Borrower for any deficiency remaining after applying the Pledged Collateral.

3.2 Lender's Appointment of Depository Broker. Lender shall have the exclusive right to appoint a "Depository Broker" (a securities broker/dealer licensed in the local jurisdiction that receives and manages the Pledged Collateral) for the purpose of receiving and possessing the Pledged Collateral.

## SECTION 4

### REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower represents and warrants to Lender that:

4.1 Capacity. Borrower has sole legal and equitable title to the Pledged Collateral or as corporate officer or director, Borrower has good and lawful authority to deliver all of the Pledged Collateral in the manner hereby contemplated to the possession of Lender.

4.2 No Liens or Restrictions. As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Borrower free and clear of any Liens or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradable and transferable securities. Borrower covenants that so long as the Loan or any obligations to Lender remain outstanding and unpaid, Borrower shall not create, assume, or suffer to exist any Lien of any kind upon any of the Pledged Collateral. Borrower further represents and warrants that the securities being pledged to Lender pursuant to this Agreement are unrestricted and free-trading and that they are outside of any holding period that might prohibit their disposition.

4.3     Non-Reliance. Borrower is not relying on Lender for purposes of trading in securities or retaining Lender to facilitate stock trades for the Borrower or on behalf of the Borrower. Borrower further represents and warrants that it has not relied, and that Lender has not made, any representation, advice, or recommendation with respect to securities, either directly or through publication. Borrower understands and concedes that Lender is not a broker-dealer under U.S. securities laws or any acts or regulations related thereto and that Lender is not engaging in the business of buying and selling securities for its own accounts or the accounts of others or facilitating trades or effecting transactions in the securities for the account of others.

Borrower further represents and warrants that it understands and agrees that only a registered broker-dealer can facilitate stock trades in accordance with Hong Kong Securities laws. It is the intent of the Parties that the Lender will only control and encumber the Pledged Collateral in accordance with this Agreement as inducement for the Lender to extend financing.

Borrower finally represents, warrants, and covenants that it has not entered into the subject Agreement to trade in stock or to circumvent the requirement that stock trades are only to be facilitated by a registered broker-dealer in accordance with applicable Hong Kong laws.

4.4     Cooperation. Borrower will cooperate in executing any document provided by Lender's Depository Broker and clearinghouse as required by applicable laws and regulations. Borrower further represents that it shall in good faith cooperate to facilitate this Loan transaction. This duty attaches upon the due execution of this Agreement and endures until its termination, whether by reason of Default or the fulfillment of all obligations thereunder. Willful failure to execute a document required or reasonably necessary in the course of this Agreement shall constitute an Event of Default.

4.5     Professional/Accredited Investor. Borrower is an accredited investor under Hong Kong law and understands and acknowledges that owning securities or borrowing against them creates uncertain and unpredictable risk which outcome may substantially reduce or collapse their value. Borrower understands that as a result of the risk associated with margining securities, borrower may lose all of the securities and their entire value. Borrower is versed in the knowledge of securities borrowing and the inherent risks such speculative activity may bring.

4.6     Waiver. Borrower will not seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement. Injunctive relief by Borrower or any interference by Borrower or central depository agency shall be an immediate

ted an incurable default. Borrower will not interfere in any way or challenge the validity or enforceability of this Agreement and the same shall be a Breach thereof.

## SECTION 5

## REPRESENTATIONS AND WARRANTIES OF LENDER

Lender represents and warrants to Borrower that:

5.1    **Short Selling, Trading, and Re-Pledging.** Lender is not engaged and will not engage, directly or indirectly, in short selling any security by borrowing the shares from any entity or person and later buying shares in the same security, then returning the borrowed shares in an effort to make a profit. Nor will Lender re-pledge or hypothecate the shares to anyone. Lender will not sell or trade in the shares for any reason whatsoever unless disposition of the shares is warranted, assuming a default, Lender is not limited to provisions of Section 7.1 of this Agreement.

5.2    **Material Event.** The Parties acknowledge that the Lender may, from time to time, provide notifications to the Depository Broker directing it to sell, transfer to and from Borrower's Account(s) to Lender's accounts(s) or any third party's account(s) of Lender's choosing, withdraw, or redeem any funds or other property in Borrower's Account(s). However, Lender will not at anytime, under any circumstance sell the Pledged Collateral, unless in Lender's sole discretion, a foreseeable adverse Material Event would require Lender to do so, such as but not limited to death, resignation, or arrest of key executives (Guo Hongxin and Ma Ming) of the Issuer; restatement of earnings; bankruptcy or liquidation; criminal investigation by a regulatory authority; suspension of business or trade licenses of the Issuer; loss of material patent that accounts for more than fifty percent (50%) of the Issuer's sales; fire causing more than eighty percent (80%) damage to a main plant or other material catastrophically the events that would impact earnings and the value of the stock; major analyst(s)' credit rating downgrade of the Issuer; major employees layoff of the Issuer affecting more than fifty percent (50%) of staff; scandals; filing of a lawsuit potentially having a devastating impact on Issuer's earnings; media notification of money laundering or other illegal activities by key executives (Guo Hongxin and Ma Ming) of the Issuer; or invasion by police or other regulatory authorities confiscating the Issuer's records. For clarity purposes, Material Event mentioned herein does not include the events of default listed in section 7.1.

5.3     Dividends, Interest, and Other Distributions. Upon maturity, Lender shall credit Borrower for all dividends, if any. No dividends will be credited to Borrower if they are not paid by issuer to the Depository Broker.

5.4     Voting Rights and Powers. Borrower is entitled to exercise all voting or other such consensual rights and powers until the security interest is enforced. Lender will not exercise any voting or other such consensual rights or powers under the terms of this Master Loan Agreement.

5.5     Best Efforts Approach. Despite stock market volatility and pricing fluctuations, best efforts will be employed by Lender to facilitate the funding of the Loan in its entirety.

## SECTION 6
## CONDITIONS TO LENDER'S OBLIGATIONS

6.1     Conditions Precedent. The obligation of Lender to make the Loan is subject to the fulfillment of the following conditions precedent (to the satisfaction of Lender):

(a)     The delivery of duly executed Master Loan Agreement and Power of Attorney;

(b)     The delivery of the stock in electronic form representing the Pledged Collateral; and

(c)     That all matters, documentations, and other instruments in connection with the Loan are satisfactory in form and substance to Lender and its counsel.

6.2     Market Conditions. Should the Pledged Collateral experience a material Valuation Event or material change in average daily trading volume prior to funding, Lender shall have the right to cease the funding of the Loan until such circumstances are dissipated or cured. The Pledged Collateral to remain with Lender, unless the Borrower repays all outstanding loans and interest, if any; or the Borrower terminates this Agreement and no amounts of loans and interest are outstanding upon which in each case, the Lender must release and return the pledged collateral to the Borrower.

# SECTION 7
## EVENTS OF DEFAULT AND REMEDIES

7.1 **Events of Default.** An "Event of Default" shall exist if any one or more of the following occurs:

(a) Failure by Borrower to pay the interest and applicable fees when due or the Approved Loan Amount when due or any other default in the performance of an obligation that is not cured within the applicable cure time; applicable cure time being 3 business days as mentioned under Section 2.8.

(b) If any representation or warranty made or failed to be made by Borrower in this Agreement or in any other Loan Document shall prove to have been materially untrue or misleading;

(c) If the class of securities provided as Pledged Collateral is delisted or trading is halted for more than three (3) consecutive Business Days by a regulatory agency or otherwise (both constituting an immediate and incurable Event of Default);

(d) If Borrower makes a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties;

(e) A decrease in the daily trading volume of Issuer securities of more than fifty percent (50%) cumulatively for three (3) consecutive trading days below the average daily trading volume for Issuer securities for the three (3) month period preceding the Closing Date, and remains below for one (1) trading day after the trading day first falls below, then the Borrower shall within three (3) Business Days, without demand, automatically transfer to the Depository Broker a one-time top-up of shares or cash equal to fifteen percent (15%) of the original number of shares pledged for this Agreement herein and cure the deficiency; as long as Borrower shows evidence that share transfer instructions have been effected on their end within three (3) business days, Borrower should not be held liable if the share transfer takes more than three (3) Business Days to settle due to processing time required at the Custodian's end.

(f)     If the Loan Documents shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared null or void or the validity or enforceability thereof shall be contested by Borrower or by any other Person;

(g)     If a Valuation Event occurs and Borrower fails to cure such Valuation Event as provided herein. A Valuation Event shall mean that the current FMP of the Pledged Collateral has fallen to less than seventy five percent (75%) of the FMP used to calculate the Approved Loan Amount, as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange (the "Default Floor"). If a Valuation Event occurs, then the Borrower shall within three (3) Business Days, without demand, automatically transfer to the Depository Broker a one-time top-up of shares or cash equal to fifteen percent (15%) more than the FMV and cure the deficiency; as long as Borrower shows evidence that share transfer instructions have been effected on their end within three (3) business days, Borrower should not be held liable if the share transfer takes more than three (3) Business Days to settle due to processing time required at the Custodian's end.

(h)     If Lender does not receive Borrower's written Proof of Funds under Section 2.6(c) no later than thirty (30) calendar days prior to the Maturity Date of the Loan; or

(i)     If the Issuer of the Pledged Collateral is notified by the appropriate regulatory agency that it is out of compliance or subject to sanction or restriction; or

(j)     If the Issuer of the Pledged Collateral experiences a material adverse event that would impact either its earnings, credit report rating, or underwriting recommendation.

7.2    **Lender's Remedy**. Lender shall not and will not have any recourse or remedy or any course of action against Borrower for Breach of this Agreement, other than occurrence of any of the foregoing Event(s) of Default, if not cured within the designated cure period, if applicable, shall terminate the Master Loan Agreement, result in acceleration of all Loan amounts, interest, expenses, and fees due thereunder, and cause the forfeiture of the Pledged Collateral. The Lender shall notify the Borrower in writing of the acceleration and the outstanding amounts owing to the Lender, whereupon the Borrower shall repay all such outstandings within three (3) business days (not subject to the lock-up period mentioned in Section 2.3) of the notice. Upon payment by the Borrower, Lender will return the Pledged Collateral to Borrower within five (5) business days of Borrower's repayment, and not forfeit the Pledged

Collateral. For the avoidance of doubt, the Lender is entitled to enforce the Pledged Collateral after the delivery of the acceleration notice, but only to the extent of the amount owing by the Borrower to the Lender, if the Borrower does not pay within three (3) business days of receiving the acceleration notice.

## SECTION 8

### Arbitration in the Event of Dispute

8.1     **Arbitration of Claims, Disputes, or Controversies.** The Parties shall endeavor to settle any dispute, controversy, or claim arising out of or relating to this Agreement including the existence, validity, interpretation, performance, breach, termination thereof, or any dispute regarding non-contractual obligations arising out of or relating to it ("Dispute") first by direct negotiation between managing directors or similar senior executives within forty five (45) days after written notice has been sent by one Party to the other Party (the "Consultation Period"). However, if direct negotiation does not result in a resolution of the Dispute within the Consultation Period, then the Parties agree to submit to mandatory and exclusive arbitration administered by the Hong Kong International Arbitration Centre under the Hong Kong International Arbitration Centre Administered Arbitration rules in force when the Notice of Arbitration is submitted by three (3) arbitrators. In such a case, each Party to the arbitration shall, in accordance with the said rules, appoint one (1) arbitrator and the arbitrators so appointed by the Parties shall in turn mutually select one (1) additional arbitrator. The place of arbitration shall be Hong Kong and the proceedings shall be conducted in the English language. The award shall be final and legally binding on the Parties and shall be subject to enforcement in any courts having jurisdiction over the Parties.

8.2     **Governing Law.** This Agreement and all Loan Documents delivered hereunder and any and all claims, controversies, and causes of action arising out of or relating to them shall be governed by the laws of the Hong Kong Special Administrative Region of the People's Republic of China, including its statutes of limitations, without giving effect to any conflict-of-laws rules that would result in the application of the laws of a different jurisdiction.

## SECTION 9

### Indemnity and Limitation of Liability

9.1     Neither party shall be liable for any indirect, incidental, opportunity loss, or consequential damages, including loss of revenue or profits or losses arising from its normal course of business, even if a Party has been advised of the possibility of such damages.

9.2     Borrower shall not hold Lender responsible for any fluctuations in the value of the Pledged Collateral that Borrower may experience during the pendency of the Loan.

## SECTION 10
## MISCELLANEOUS

10.1     Notices. All notices and communications to either of the Parties by the other shall be in writing, sent by overnight mail by a reputable commercial carrier or electronically and shall be deemed duly given on the earlier of the date the same is sent, if via electronic communications, or received, when deposited in the mail, postage prepaid, as follows:

If to Lender: AMERICA 2030 CAPITAL LIMITED
Attention: Mark Bentley, Director of Operations
Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central,
Sheung Wan, Hong Kong
bentley@America2030.com; +16232132500

If to Borrower: TOURNAN TRADING PTE LTD

Attention: below parties

| Name | Address | Email | Tel |
|------|---------|-------|-----|
| Ma Ming | No. 2111 Chengxin Avenue, High-tech Industrial Park, Jiangning District, Nanjing, Jiangsu, 211112, P.R. China | frankma@vip.163.com | +8613805188068 |
| Xie Yu | | xieyucssc@aliyun.com | +8613801598802 |
| Xiong Hanqing | | camellia_87@vip.163.com | +8613815870050 |
| Zhong Zhan | | michaelzhong@vip.163.com | +8618021510996 |
| Ang Kay Tiong | 4 Shenton Way SGX Centre 2, #07-03, Singapore 068807 | angkt@stirlingcoleman.com | +6596793630 |
| Sherry Ng | 8 Shenton Way AXA Tower #25-02 Singapore 068811 | sherry.ng@swissasia-group.com | +6582822990 |

Either Party may designate by notice in writing to the other a new address to which notices, requests, and other communications hereunder shall be given.

10.2    Severability. If any of the provisions of this Agreement or in any of the Loan Documents is found by an arbitral tribunal and/or court of competent jurisdiction to be unlawful, then such provision is modified to meet legal conformity or, if impracticable, is stricken out entirely as if it were never included and the remainder of the terms and conditions contained in this Agreement or any of the Loan Documents shall continue to be in full force and effect.

10.3    Survival. Except as herein provided, all representations, warranties, and covenants made in this Agreement shall survive the execution, delivery, and termination of this Agreement.

10.4    Waivers. No waiver of any provision of this Agreement shall be effective unless agreed to in writing by the Parties. No course of dealing between Borrower and Lender shall operate as a waiver of any of the rights of the Parties under this Agreement with the exception of an action for injunctive relief, which shall not be permitted or attempted and shall be nullified upon application.

10.5    Gender and Number. Unless the context otherwise requires, when used herein, the singular includes the plural, and vice-versa, and the masculine includes the feminine and neuter, and vice-versa.

10.6    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

10.7    Confidentiality. This Agreement is to be kept confidential and is not to be reproduced in any manner whatsoever for persons other than the Parties hereto. Specifically, each Party agrees to maintain the confidentiality of the business, trade, finances, and methods ("Confidential Information") of the other Party and not disclose the Confidential Information to any person other than those whose knowledge is essential for the performance of the Loan Documents. Lender will not reveal the existence of this Agreement to the media or any regulatory body or government agency, unless ordered to do so by court of law.

10.8 **Force Majeure.** Notwithstanding any provision of this Agreement, neither Party shall be liable for its inability in performing any of its obligations hereunder if such inability is caused by or arises as a result of circumstances beyond its reasonable control ("Force Majeure Event"). For the purposes of this Clause, a Force Majeure Event shall include, without limitation, inability or delay in performance caused through acts of God, fire, flood, riot, degradation in stock value, stock market crash, illiquidity of the stock and other adverse market conditions, lightning, explosion, civil commotion, malicious damage, storm, tempest, electronic malfunctions, acts or omissions of telecommunications carriers, acts of government or other regulatory authority, acts or omissions of persons or bodies for whom the Party affected thereby is not responsible, and any other circumstances beyond the reasonable control of the relevant Party.

The Party affected by the Force Majeure Event shall promptly notify the other Party of the estimated extent and duration of such inability to perform its obligations hereunder. This Agreement shall remain in force until such time that the affected Party can perform.

10.9 **Assignment.** This Agreement cannot be assigned nor transferred by a Party without the prior written consent of the other Party. Such consent shall not be unreasonably withheld.

10.10 **Entire Agreement.** This Agreement contains the entire agreement between the Parties hereto and is legally binding upon them as of the date of the execution hereof.

10.11 **Amendments.** Amendments to this Agreement (including the adding or updating of any annexes, appendices, or schedules) shall not be effective unless in writing and signed by authorized signatories on behalf of both Parties.

10.12 **Disclaimer.** IT IS MUTUALLY UNDERSTOOD AND AGREED THAT LENDER HAS FINANCIAL INTEREST AND PRIVILEGE IN THE PLEDGED SHARES PURSUANT TO THE PARTIES' UNDERSTANDING AND CONTRACTUAL AGREEMENT. BORROWER HAS NOT AND WILL NOT RELY ON ANY MARKETING MATERIAL OR STATEMENTS OF MATERIAL FACT MADE BY SALES AGENTS OR LENDER PRIOR TO, DURING, OR FOLLOWING THE CLOSING OF THIS TRANSACTION. ALL SUCH STATEMENTS AND MARKETING MATERIAL ARE HEREBY PURGED FROM THIS LOAN AGREEMENT AS THOUGH NO MARKETING MATERIAL EVER EXISTED OR STATEMENTS OF MATERIAL FACT WERE EVER MADE. BORROWER ATTESTS THAT, AT ALL TIMES, IT WAS REPRESENTED BY LEGAL

COUNSEL AND/OR BORROWER HAS HAD AMPLE OPPORTUNITY TO CONSULT ONE. BORROWER'S DECISION IS AT WILL AND SOLELY BASED ON ITS INDEPENDENT JUDGMENT. BORROWER HAS NOT BEEN DECLARED BY ANY COURT OF LAW TO BE INCOMPETENT OR OF NOT SOUND MIND. BORROWER IS FREE OF ANY EXTERNAL INFLUENCE OF OTHERS OR INFLUENCE OF DRUGS OR ALCOHOL WHEN CONSIDERING OR ENTERING INTO THIS AGREEMENT. BORROWER'S MIND IS FREE OF INFLUENCES OF DURESS, BODILY THREATS, TORTURE, KIDNAPING, EXTORTION, OR COERCION. BORROWER HAS EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY LENDER, IF ANY. BORROWER UNDERSTANDS THAT MARKET CONDITIONS OR FORCE MAJEURE MAY CAUSE LENDER TO ADVANCE THE LOAN IN DISBURSEMENTS OR POSTPONE FUNDING. LENDER AGREES TO FOLLOW THE TRUTH IN LENDING ACT AND DOES NOT DISCRIMINATE ON THE BASIS OF SEX, RACE, NATIONALITY, OR RELIGION. BORROWER ASSUMES THE BURDEN OF TOPPING UP WHEN REQUIRED TO DO SO. BORROWER IS AWARE THAT MARKET CONDITIONS MAY CAUSE THE VALUE OF SECURITIES TO DECLINE. BORROWER CONCEDES THAT LENDER IS NOT RESPONSIBLE FOR THE DEGRADATION OF THE STOCK VALUE, WHETHER OWING TO AN ACTION(S) OR INACTION(S) OF LENDER. A DECLINE IN VALUE MAY REQUIRE ADDITIONAL SECURITIES OR CASH TO INCREASE THE VALUE OF THE COLLATERAL. A DEFAULT WILL CAUSE FORFEITURE OF SECURITIES. INJUNCTIVE RELIEF APPLICATION BY BORROWER AND ANY INTERFERENCE BY THE DEPOSITORY AGENCY ARE NOT ALLOWED. BORROWER HEREBY WAIVES AND FOREVER DISCHARGES LENDER AGAINST ANY AND ALL CLAIMS UNDER SECURITIES LAWS. TAX CONSEQUENCES ARE THE RESPONSIBILITY OF BORROWER. WHETHER AS A RESULT OF DEFAULT OR OTHERWISE, LENDER IS AUTHORIZED TO CONVERT COLLATERAL IN ORDER TO PROTECT LENDER'S INTEREST AND INDUCE LENDER TO PROVIDE FINANCING. BORROWER MAY OR MAY NOT TOP-UP IN THE EVENT OF A DROP IN VALUE OF COLLATERAL BUT WAIVES ITS RIGHT TO ASSERT A CLAIM OF CONVERSION, SINCE LENDER MAY TRANSACT AT ANY TIME IN SAID PLEDGED COLLATERAL AND MAY DO SO IN ORDER TO FUND THE LOAN. LENDER RESERVES THE RIGHT TO TEST THE PLEDGED COLLATERAL FOR VALIDITY AND EFFICACY AND SELL PRIOR TO FUNDING. LENDER HAS THE PRIVILEGE TO SAID PLEDGED COLLATERAL AND LENDER IS NOT ESTOPPED FROM ASSERTING ITS RIGHTS TO SAID COLLATERAL IN ACCORDANCE WITH LENDER'S RISK MANAGEMENT POLICY AND IN ORDER TO PROTECT ITS INTERESTS. LENDER AND ITS LOAN OFFICERS HAVE NOT PROVIDED LEGAL OR TAX ADVICE OF ANY KIND TO BORROWER. BORROWER IS TO

CONSULT A TAX PROFESSIONAL FOR ANY TAX ADVICE. NEITHER BORROWER NOR LENDER HAVE RECEIVED A KICK-BACK OR BRIBE OF ANY KIND IN ORDER TO INDUCE LENDER TO PROVIDE A FINANCING FACILITY. LENDER IS NOT A BROKER-DEALER OR FINANCIAL ADVISOR. THIS DISCLOSURE PROVIDES FULL TRANSPARENCY OF RISKS INVOLVED. LENDER IS NOT COMPENSATED BY ANY THIRD PARTY. NEITHER BORROWER NOR LENDER WILL PARTICIPATE IN OR ENGAGE IN ANY MONEY LAUNDERING SCHEME. THERE ARE NO PENDING NOR HAVE THERE BEEN ANY LAWSUITS OF ANY TYPE AGAINST LENDER IN ANY JURISDICTION OR COUNTRY. LENDER HAS NEVER BEEN SANCTIONED NOR FINED BY ANY AUTHORITY OR JURISDICTION. LENDER DOES NOT PROVIDE INVESTMENT ADVICE AND ITS LOAN OFFICERS AND SALES STAFF ARE PROHIBITED FROM DOING SO. BORROWER MUST INSURE THAT THE PLEDGED COLLATERAL STAYS WITHIN LENDER'S VALUE REQUIREMENT IN ACCORDANCE WITH THE MASTER LOAN AGREEMENT. LENDER WILL NOT BE LIABLE FOR DEVALUATION OF SECURITIES DURING THE TERM OF THE LOAN. LENDER IS NOT AN INSIDER OF THE SECURITIES BEING PLEDGED BY BORROWER AND LENDER DOES NOT AND HAS NOT OFFERED TO BUY OR SELL ADVICE TO BORROWER. LENDER MAY EXERCISE DOMINION OVER THE PLEDGED COLLATERAL IN ACCORDANCE WITH THIS AGREEMENT. BORROWER CONCEDES TO LENDER'S RIGHT TO TRANSACT IN THE PLEDGED COLLATERAL. A DEFAULT OF THE LOAN WILL CANCEL LENDER'S OBLIGATION TO BORROWER. BORROWER WILL NOT USE LOAN PROCEEDS FOR ANY ILLEGAL ACTIVITY, INCLUDING WITHOUT LIMITATIONS, USE OF LOAN PROCEEDS IN DRUG TRADE OR SUPPORT OF TERRORIST GROUPS. BORROWER WILL NOT TRANSACT WITH ANY ENTITY ON ANY INTERNATIONAL SANCTIONED LIST. LENDER IS NOT AFFILIATED WITH ANY GOVERNMENT AGENCY. BORROWER AGREES THAT THE LOAN IS SUITABLE FOR BORROWER'S NEEDS. LENDER HAS THE RIGHT, BUT NOT THE OBLIGATION, TO REFINANCE OR INCREASE LOAN AMOUNT IF THE VALUE OF SECURITIES INCREASE DURING THE TERM OF THE LOAN. BORROWER HAS RISK-TOLERANCE AND HAS FINANCIAL ABILITY AND LIQUID ASSETS TO POST MARGIN IN THE EVENT OF DEFAULT. BORROWER REPRESENTS THAT IT IS NOT AFFILIATED WITH ANY U.S. STOCK EXCHANGE. BORROWER REPRESENTS THAT BORROWER HAS FULL OWNERSHIP OF THE SECURITIES AND LEGAL CUSTODY AND AS OF THE DATE OF THIS AGREEMENT, IS NOT A DEFENDANT IN ANY LAWSUIT WHERE THE OWNERSHIP AND CONTROL OF THE PLEDGED SHARES ARE CHALLENGED BECAUSE LENDER WILL NOT BE A PARTY TO ANY SUCH CHALLENGE.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the day and year written below. It is specifically agreed and understood that this Agreement shall not be binding upon the Parties until the date it is actually signed by Lender and Borrower, and that shall be the effective date of this Agreement.

**BORROWER:**

**LENDER:**

TOURNAN TRADING PTE LTD

AMERICA 2030 CAPITAL LIMITED

_____
Signature

_____
Signature

Ma Ming, Director

_____
Name and Title

VOL SKUROV, MANAGING PARTNER

_____
Name and Title

June 4. 2018

_____
Date

JUNE 12, 2018

_____
Date

**EXHIBIT 1**
**CLOSING STATEMENT**

_____, 2018

Re: Master Loan Agreement (the "MLA") by and between TOURNAN TRADING PTE LTD ("Borrower") and AMERICA 2030 CAPITAL LIMITED ("Lender").

On _____,2018, you delivered and posted shares of SUNPOWER GROUP LTD (SPWG:SP) to Lender's Account pursuant to the MLA, calculated based upon a fifty-five percent (55%) LTV. The Loan proceeds, based on current stock price, are to be distributed to Borrower on the Closing Date under the MLA as follows:

| | | |
|---|---|---|
| Approved Loan Amount: | $_____ | USD |
| Lender's Origination Fee: | 3% | USD |
| Lender's Maintenance Fee: | 0.5% per annum | USD |
| Third Party Expenses: | $[●] | USD |
| Lender's Legal Expenses: | $15,000.00 | USD |
| Lender's Processing Fee: | $3,500.00 | USD |
| Balance Payment to Borrower: | $[●] | USD |

The Balance Payment will be settled (paid) to your account on the Closing Date per the instructions provided in Section 2.7 of the MLA. Specifically, to the following:

| Bank/Institution Name | UBS AG, Singapore |
|---|---|
| Swift Code No. | UBSWSGSG |
| Account Number | 0546 - 00865330 |
| Account Name | MA MING |
| Address of Account | One Raffles Quay #50-01 North Tower Singapore 068583 |

## WITNESS

The foregoing instrument was acknowledged before me this 4th day of June , 2018,
by Su, Qiyi (name) Legal & Compliance Manager (occupation). He/she is personally known to me or has produced _____ as identification.

SIGNATURE OF WITNESS

*Contacts:*     USA     America 2030 Capital, LLC
1301 Shiloh RD. NW
Suite 1231
Kennesaw, GA. 30144

United
Kingdom

America 2030 Capital Limited
Kemp House
160 City Road
London, United Kingdom
EC1V 2NX

Hong Kong

America 2030 Capital Limited
Unit 1411, 14/Floor Cosco Tower,
183 Queen's Road Central, Sheung
Wan, Hong Kong

www.america2030.net     ©1986-2018 All rights reserved.

# AMERICA 2030 CAPITAL LIMITED

## Investment Banking/Stock Loans

### IRREVOCABLE POWER OF ATTORNEY

By

TOURNAN TRADING PTE LTD, as Principal

And

AMERICA 2030 CAPITAL LIMITED, as Attorney In Fact

DATED    OF        2018

## POWER OF ATTORNEY

THIS IRREVOCABLE POWER OF ATTORNEY is granted as of this ____ day of _____ ,2018 By TOURNAN TRADING PTE LTD, for itself, representatives, affiliates, and assigns, with a principal place of business located at 55 Lorong L Telok Kurau, 3-63 Bright Centre, Singapore 425500 (hereinafter, the "Principal"), which represents and warrants that they have the capacity and standing to grant AMERICA 2030 CAPITAL LIMITED (hereinafter, the "Attorney In Fact") this Power of Attorney, as the holder of the securities trading account no. [_____] located at:

Name of Subject Account:

Name of Depository Broker:

Address of Depository Broker:

| Authorized Director Acting on Behalf of Attorney In Fact | Specimen Signature |
|---|---|
| **Name:** Val Sklarov or Mark Bentley<br><br>**Address:** Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central, Sheung Wan, Hong Kong<br><br>**Phone:** +1 (623) 213-2500<br><br>**Email:** val@america2030.net<br>          bentley@america2030.net | |

1.    **SCOPE OF AUTHORITY**

The Attorney In Fact's scope of authority includes, but is not limited to: its ability to have access to, receive, and enquire about the information pertaining to the depository account(s) ("Depository Account(s)" or "Account(s)"); place, revise, or cancel orders for sales and purchase of securities; deposit, withdraw, and transfer funds or securities to and from the Attorney In Fact's account(s) or any third party account(s) of the Attorney In Fact's choosing; request advancement of the proceeds of securities transactions; execute all contracts and other documents necessary for use of the services and/or products provided by the Depository Broker in relation to the Account(s); close the Account(s); and exercise all rights and privileges and

perform all duties and obligations which may now or in the future pertain to the Principal as holder of the Account.

## 2. PRINCIPAL's REPRESENTATION

The Principal acknowledges that the Attorney In Fact may, from time to time, provide notifications to the Depository Broker directing it to sell, transfer to and from the Principal's Account(s) to any third party's account(s) of the Attorney In Fact's choosing, withdraw, or redeem any funds or other property in the Principal's Depository Account(s). However, the Attorney In Fact will not at anytime, under any circumstance sell the Pledged Collateral, unless in the Attorney In Fact's sole discretion, a foreseeable adverse Material Event would require the Attorney In Fact to do so, such as but not limited to death, resignation, or arrest of key executives; restatement of earnings; bankruptcy or liquidation; criminal investigation by a regulatory authority; suspension of business or trade licenses; loss of material patent that accounts for more than fifty percent (50%) of company sales; fire causing more than eighty percent (80%) damage to a main plant or other material catastrophic events that would impact earnings and the value of the stock; major analyst(s)' credit rating downgrade; major employees layoff effecting more than fifty percent (50%) of staff; scandals; filing of a lawsuit potentially having a devastating impact on company earnings; media notification of money laundering or other illegal activities by key executives; or invasion by police or other regulatory authorities confiscating company records. For clarity purposes, Material Event mentioned herein refers to the events described under Section 5.2 of the Master Loan agreement and does not include the events of default listed in section 7.1 of the Master Loan Agreement.

## 3. WAIVER

The Principal hereby unconditionally and irrevocably relinquishes, forfeits, and renounces any right it may now or in the future have over the Depository Account(s) to the Attorney In Fact. The Principal shall not claim any right or privilege or exercise any control whatsoever over the Account(s) and shall not issue any instructions to the Depository Broker or directly or indirectly interfere with the Attorney In Fact's instructions to said Depository Broker or attempt to seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Irrevocable Power of Attorney.

## 4. PRINCIPAL RATIFIES ATTORNEY'S IN FACT ACTS

The Principal ratifies and confirms whatever the Attorney In Fact lawfully does or purports to do pursuant to the authority granted to it by this Irrevocable Power of Attorney.

5.   **DEPOSITORY BROKER INDEMNITY**

The Principal acknowledges that the Principal is responsible for, and bound by, the instructions that the Attorney In Fact gives the Depository Broker and does hereby indemnify, discharge, and forever hold harmless the Depository Broker in relation to the actions of the Attorney In Fact and will not take any action or seek remedy against the Depository Broker with respect to it complying with and enforcing this Irrevocable Power of Attorney.

6.   **INDEPENDENT LEGAL SIGNIFICANCE**

This Irrevocable Power of Attorney is of independent legal significance and incorporates the rights, waivers, and obligations of the Master Loan Agreement ("MLA"). To the extent that the provisions of this Irrevocable Power of Attorney conflicts with the MLA, this Irrevocable Power of Attorney governs.

7.   **EFFECTIVENESS**

This Power of Attorney is hereby made Irrevocable by the Principal and shall remain in full effect until such time as the Attorney In Fact revokes it by providing a certified board resolution to the Depository Broker to effect the termination of the authority granted to the Attorney In Fact under this Irrevocable Power of Attorney.

8.   THE PRINCIPAL REPRESENTS THAT THE SECURITIES AND OR PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY ILL-GOTTEN GAIN OR A RESULT OF ANY FRAUDULENT ACTIVITY WHICH WILL FALL UNDER HONG KONG PENAL LAW. THE PRINCIPAL IS NOT UNDER THE INFLUENCE OF DRUGS OR ALCOHOL WHEN GRANTING THIS IRREVOCABLE POWER OF ATTORNEY. THE PRINCIPAL HAS NOT BEEN DECLARED BY A COURT OF LAW TO BE MENTALLY INCOMPETENT. THE SUBJECT SHARES AND PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY PENDING LITIGATION AND ARE FREE OF ANY LIEN OR ENCUMBRANCE. THE PRINCIPAL ORDERS AND MANDATES THE DEPOSITORY BROKER THAT IRRESPECTIVE OF HOW THIS IRREVOCABLE POWER OF ATTORNEY MAY BE INTERPRETED, ANY AND ALL ENTITLEMENT ORDERS

SHALL COME SOLELY FROM THE ATTORNEY IN FACT AND SHALL NOT BE CONTESTED. THE PARTIES HAVE EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY THE ATTORNEY IN FACT. THE DEPOSITORY BROKER SHALL BE FULLY INDEMNIFIED BY THE PRINCIPAL AGAINST ANY LIABILITIES OCCASIONED BY THIS IRREVOCABLE POWER OF ATTORNEY.

As of this date, the Attorney In Fact will become and is hereby designated as the sole and exclusive authority over the subject Depository Account(s). This Power of Attorney takes effect on the date first stated above.

For and on behalf of Principal

Signature

Ma Ming
Full Name

June , 4 2018
Date

WITNESS:

The foregoing instrument was acknowledged before me this 4th day of June, 2018, by Sun Qing (name) Legal 'o Compliance Manager (occupation). He/she is personally known to me or has produced _____ as identification.

Signature of Witness

USA                          America 2030 Capital, LLC
                             1301 Shiloh RD. NW
                             Suite 1231
                             Kennesaw, GA. 30144

United Kingdom               America 2030 Capital Limited
                             Kemp House
                             160 City Road
                             London, United Kingdom
                             EC1V 2NX

Hong Kong                    America 2030 Capital Limited
                             Unit 14D, 14 Floor, Cosco Tower, 183
                             Queen's Road Central, Sheung Wan, Hong
                             Kong

# AMERICA **2030** CAPITAL LIMITED

## Investment Banking/Stock Loans

CUSTODIAN MANAGEMENT AGREEMENT

Between

TOURNAN TRADING PTE LTD, as Borrower;

AMERICA 2030 CAPITAL LIMITED, as Lender;

And

[●], as Depository Broker

DATED        of                2018

Custodian Management Agreement

This Custodian Management Agreement (this "Agreement" or the "CMA") is entered into, effective on the date of execution hereof, by and between:

TOURNAN TRADING PTE LTD, for itself, representatives, affiliates, and assigns, with a principal place of business located at 55 Lorong L Telok Kurau, 3-63 Bright Centre, Singapore 425500, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("Borrower");

AMERICA 2030 CAPITAL LIMITED, for itself, representatives, affiliates, and assigns, with an office located at Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central, Sheung Wan, Hong Kong, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("Lender");

And

_____ for itself, affiliates, and subsidiaries, with a principal place of business located at_____, and represented by_____,which represents and warrants that they have the capacity and standing to enter into this Agreement (hereinafter "Depository Broker").

Borrower, Lender, and Depository Broker are hereinafter sometimes individually referred to as a "Party" and collectively as the "Parties".

1    Scope of this Agreement.

1.1    Lender and Borrower have entered into a Master Loan Agreement (the "MLA"), which is independent of this Agreement and the Depository Broker is not bound by it, may not interpret or attempt to adhere to it, shall not base Lender's entitlement order ("Entitlement Order") on it, shall not refuse to follow Lender's Entitlement Order, or attempt to interfere with any such Entitlement Order.

2    Control By Lender.

2.1    The Parties acknowledge that the Lender may, from time to time, provide notifications to the Depository Broker directing it to sell, transfer to and from Borrower's

Account(s) to any third party's account(s) of Lender's choosing, withdraw, or redeem any funds or other property in Borrower's Depository Account(s). However, Lender will not at anytime, under any circumstance sell the Pledged Collateral, unless in Lender's sole discretion, a foreseeable adverse Material Event would require Lender to do so, such as but not limited to death, resignation, or arrest of key executives; restatement of earnings; bankruptcy or liquidation; criminal investigation by a regulatory authority; suspension of business or trade licenses; loss of material patent that accounts for more than fifty percent (50%) of company sales; fire causing more than eighty percent (80%) damage to a main plant or other material catastrophic events that would impact earnings and the value of the stock; major analyst(s)' credit rating downgrade; major employees layoff affecting more than fifty percent (50%) of staff; scandals; filing of a lawsuit potentially having a devastating impact on company earnings; media notification of money laundering or other illegal activities by key executives; or invasion by police or other regulatory authorities confiscating company records. For clarity purposes, Material Event mentioned herein refers to the events described under Section 5.2 of the Master Loan agreement and does not include the events of default listed in section 7.1 of the Master Loan Agreement.

2.2    The Depository Account(s) held by the Depository Broker in favor of Lender are as follows:

| List of the Dedicated Depository Account(s) (Maintained by the Borrower with the Depository Broker Specifying Account Name, Signatory, Address, and Account Number): | |
|---|---|
| | |
| | |
| | |
| | |

2.3    The Lender's lien and security interest also includes all proceeds of the foregoing, and all proceeds of proceeds and trades. Borrower represents and warrants to both Lender and the Depository Broker that it owns the Pledged Collateral free and clear of any lien, whether voluntary or involuntary.

2.4    The Borrower agrees to bear all reasonable costs, fees, and out of pocket expenses that might arise in the course of enforcing, executing, and maintaining this Agreement.

2.5 For the services provided, the Depository Broker will be entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Depository Account(s). For the avoidance of doubt, the annual custodian management charge is exclusive of any transaction fee, personal income tax, and other administrative costs and fees. Such nonrefundable fee shall be paid one year in advance. First year fee shall be deducted from the Loan proceeds.

2.6 Borrower hereby agrees to unconditionally and irrevocably relinquish, forfeit, and renounce any right it may now or in the future have over the Depository Account(s) to the Lender. Borrower shall not claim any right or privilege or exercise any control whatsoever over the Account(s) and shall not issue any instructions to the Depository Broker or directly or indirectly interfere with Lender's instructions to said Depository Broker or attempt to seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement. Any attempt for injunctive relief by Borrower or any interference by central depository agency shall be an immediate and an incurable default.

3 Borrower's Rights in the Dedicated Depository Account(s).

3.1 Until the Lender notifies the Depository Broker in writing that the Lender's security interest in the Depository Account(s) have terminated, the Depository Broker shall not distribute to the Borrower any securities, assets, funds, or property currently or in the future held in the Depository Account(s) whatsoever.

4 Depository Broker's Responsibility.

4.1 The Depository Broker shall immediately notify the Lender of the receipt of the Pledged Collateral into the Depository Account(s), including the amount of shares deposited, the stock price at the time of receipt, and confirmation that the Account(s) is now solely under the custody, care, and control of the Lender.

4.2 The Depository Broker will not be liable to the Borrower for complying with any Entitlement Orders originated by the Lender and the Borrower hereby waives any rights to claims against the Depository Broker in connection thereto. Further, it is agreed that the Depository Broker is

not obliged to verify and will not verify whether Lender has the right to give the Entitlement Order.

## 5    Indemnity.

5.1    Borrower acknowledges that Borrower is bound by the instructions that the Lender gives the Depository Broker and does hereby indemnify, discharge, and forever hold harmless the Depository Broker, its officers, directors, employees, agents, and shareholders in relation to the actions of the Lender and will not take any action or seek remedy against the Depository Broker with respect to it complying with and enforcing this Agreement.

## 6    Termination.

6.1    Lender may at any time terminate this Agreement on not less than thirty (30) days written notice to the Depository Broker and the Borrower. The Depository Broker may terminate this Agreement on not less than thirty (30) days written notice to the Lender and the Borrower. Upon such termination by the Depository Broker, the Lender shall within two (2) Business Days issue an Entitlement Order to the Depository Broker ordering the Depository Broker to promptly transfer the Pledged Collateral to the Lender or to such person(s) under the written instructions issued by or on behalf of the Lender. Once a transfer is made pursuant to such Entitlement Order, the Depository Broker's obligations under this Agreement are or deemed to have been fully discharged.

## 7    Miscellaneous.

7.1    Borrower may not assign, transfer, charge, or novate any of its rights or obligations under this Agreement.

7.2    Capitalized terms used but not defined herein shall have the meanings given to such terms in the MLA.

7.3    All communications from and to any of the Parties hereto may be transmitted by mail to the addresses listed below or electronically and shall, in the case of the latter, have full legal force and effect, including electronic signatures contained therein.

**Lender:**

**AMERICA 2030 CAPITAL LIMITED**

Attention: Val Sklarov, Director and CEO

Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central,

Sheung Wan, Hong Kong

val@America2030.net +1 623-213-2500

**Borrower:**

TOURNAN TRADING PTE LTD

Attention: below parties

| Name | Address | Email | Tel |
|------|---------|-------|-----|
| Ma Ming | No. 2111 Chengxin Avenue, High-tech Industrial Park, Jiangning District, Nanjing, Jiangsu, 211112, P.R. China | frankma@vip.163.com | +8613805188068 |
| Xie Yu | | xieyucssc@aliyun.com | +8613801598802 |
| Xiong Hanqing | | camellia_87@vip.163.com | +8613815870050 |
| Zhong Zhan | | michaelzhong@vip.163.com | +8618021510998 |
| Ang Kay Tiong | 4 Shenton Way SGX Centre 2, #07-03, Singapore 068807 | angkt@stirlingcoleman.com | +6596793630 |
| Sherry Ng | 8 Shenton Way AXA Tower #25-02 Singapore 068811 | sherry.ng@swissasia-group.com | +6582822990 |

**Depository Broker:**

_____

_____

7.4    BORROWER REPRESENTS THAT THE SECURITIES AND OR PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY ILL-GOTTEN GAIN OR A RESULT OF ANY FRAUDULENT ACTIVITY WHICH WILL FALL UNDER HONG KONG PENAL LAW. BORROWER IS NOT UNDER THE INFLUENCE OF DRUGS OR ALCOHOL WHEN ENTERING INTO THIS AGREEMENT. BORROWER HAS NOT BEEN DECLARED BY A COURT OF LAW TO BE MENTALLY INCOMPETENT. THE SUBJECT SHARES AND PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY PENDING LITIGATION AND ARE FREE OF ANY LIEN OR ENCUMBRANCE. BORROWER ORDERS AND MANDATES THE DEPOSITORY BROKER THAT

IRRESPECTIVE OF HOW THIS AGREEMENT MAY BE INTERPRETED, ANY AND ALL ENTITLEMENT ORDERS SHALL COME SOLELY FROM LENDER AND SHALL NOT BE CONTESTED. THE PARTIES HAVE EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY LENDER. THE DEPOSITORY BROKER SHALL BE FULLY INDEMNIFIED BY BORROWER AGAINST ANY LIABILITIES OCCASIONED BY THIS AGREEMENT.

SIGNATORIES

Depository Broker: (Include Chop)

_____        _____        _____
Signature             Name and Title              Date

****************************************************************************************

Borrower: (Include Chop)

_____        Mahiney , Director        June 4 2018
Signature             Name and Title              Date

NOTARY PUBLIC
Notary Public is only certifying Borrower's signature

****************************************************************************************

Lender: (Include Chop)

_____        VAL SKLANOV                June 10, 2018
Signature             Name and Title MANAGING     Date
                                     MEMBER

NOTARY PUBLIC
Notary Public is only certifying Lender's signature

CMA                   AMERICA 2030 Capital Limited        v2, May 23, 2018        Page 7 of 8



*Contacts:*

USA

America 2030 Capital, LLC
1301 Shiloh RD. NW
Suite 1231
Kennesaw, GA. 30144

UNITED
KINGDOM

America 2030 Capital  Limited
Kemp House
160 City Road
London United Kingdom
EC1V 2NX

HONG KONG

America 2030 Capital Limited
Unit 1411  14 Floor, Cosco Tower
183  Queen's Road Central, Sheung
Wan Hong Kong

www.america2030.net    ©1986-2018 All rights reserved.

# EXHIBIT B

## MASTER LOAN AGREEMENT

This Master Loan Agreement supersedes all pervious term sheets and discussions and is the final documentation of the Parties' undertakings which is entered into and effective on the date of mutual execution hereof by and between:

SUNPOWER BUSINESS GROUP PTE LTD for itself, representatives, affiliates, and assigns, with a principal place of business located at 55 Lorong L Telok Kurau, #3-63 Bright Centre, Singapore 425500, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("Borrower");

AND

AMERICA 2030 CAPITAL LIMITED, for itself, representatives, affiliates, and assigns, with an office located at Unit 1411, 14/Floor Cosco-Tower, 183 Queen's Road Central, Sheung Wan, Hong Kong, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("Lender").

Borrower and Lender are hereinafter sometimes individually referred to as a "Party" and collectively as the "Parties".

## SECTION 1
## DEFINITIONS

1.1     Defined Terms. As used in this Agreement and any other agreement(s) entered into by the Parties, the following terms shall have the following meanings:

"Agreement" shall mean this Master Loan Agreement, including any Exhibits or Schedules hereto, and as amended or supplemented from time to time, or as incorporated by reference into subsequent agreements.

"Approved Loan Amount" is the amount that Lender, subject to market conditions and Lender's discretion, is willing to fund the Loan up to.

"Business Day" shall mean the working day of a calendar week, except Saturday, Sunday and public holidays in accordance with relevant applicable laws – Hong Kong & Singapore

"Breach" shall mean any of the Events of Default specified in this Agreement and other Loan Documents that constitute a default unless specified otherwise.

"Closing Date" shall mean the day in which the Pledged Collateral has been delivered to and confirmed by the Depository Broker.

"Closing Statement" shall mean a statement in the form attached to this Agreement as Exhibit 1, which Closing Statement shall be delivered by Lender to Borrower following the delivery of the Pledged Collateral to the Depository Broker.

"Currency" the Loan and all interest and fees shall be in United States of American Dollars ("USD"). If the Pledged Collateral is a security which is priced and traded in a market and currency other than USD, the Parties agree to convert to USD for all purposes.

"Default" shall mean any of the Events of Default specified in this Agreement and other Loan Documents.

"Depository Account" or "Account" shall mean the account(s) established pursuant to this Agreement and other Loan Documents for the receipt and possession of the Pledged Collateral.

"Depository Broker" shall mean the financial institution selected by Lender for the receipt of the Pledged Collateral and any top-up.

"Event of Default" shall mean any of the events specified in Section 7.1 hereof.

"Fair Market Price" ("FMP") shall mean with respect to the stock or securities provided as Pledged Collateral the average of the last sale price on three (3) consecutive Business Days prior to closing. That average price shall be the per-share price of the Pledged Collateral used to establish its fair market value ("FMV").

"FMV" shall mean the amount, expressed in US dollars, equating to the FMP for each share of the Pledged Collateral multiplied by the number of such shares comprising the Pledged Collateral.

"Issuer" shall mean the corporate entity that has distributed shares of SUNPOWER GROUP LTD (SPWG:SP).

"Lender's Remedy" shall mean termination of the Loan and forfeiture of the Pledged Collateral in accordance with Section 7.2 *infra*.

"Lien" shall mean, with respect to any asset, any mortgage, lien, pledge, charge, security interest, or encumbrance of any kind in respect of such asset.

"Loan" shall mean the total contractual gross amount lent to Borrower by Lender on a nonrecourse basis for the specified term and subject to the stated conditions.

"Loan Documents" shall mean collectively, this Agreement, the Power of Attorney, the Closing Statement, and any other agreements, documents, instruments, exhibits, or statements delivered in connection with the Loan. Each to be read and construed together in a manner so as to give meaning and effect to all their provisions.

"Material Event" is such that is individually exemplified in Section 5.2.

"Maturity Date" shall have the meaning provided in Section 2.6(a).

"Party" shall mean Lender or Borrower, as the case may be, and their agents, representatives, successors, affiliates, and assigns.

"Proof of Funds" shall mean cash or liquid securities.

"Term of the Loan" shall mean when the Loan starts as defined by Verification Day and ends as defined by Maturity Date.

"Pledged Collateral" shall mean the actual shares delivered to Lender as a consideration for the Loan and any shares or proceeds resulting from any transaction, split-up, revision, reclassification, or other like change of the Pledged Collateral.

"Valuation Event" shall mean that the FMP of the Pledged Collateral has fallen to less than seventy five percent (75%) of the FMP used to calculate the Approved Loan Amount as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange.

"Verification Day" shall mean the Business Day after the Pledged Collateral has been received and posted to Lender's account prior to Closing Date.

1.2    Use of Defined Terms. All terms defined in this Agreement shall have such defined meanings when used herein and in any other Loan Documents made or delivered in conjunction with this Loan transaction.

1.3    Lender's Discretion. Lender has the discretion and right to elect to not proceed with this Agreement at any time up until the Closing Date.

1.4    Statements as to Knowledge. Any statements, representations, or warranties which are based upon the knowledge of Borrower shall be deemed to have been made after due inquiry with respect to the matter in question but without Borrower being required to seek an opinion of counsel with respect thereto.

# SECTION 2
## MATERIAL TERMS OF THE LOAN

### 2.1    Approved Loan Amount.

(a)    Subject to all of the terms and conditions of this Agreement, Lender agrees to lend to Borrower funds equal to up to Twenty Five Million ($25,000,000.00) USD of the current FMV of the Pledged Collateral. The Approved Loan Amount shall typically be funded within three (3) Business Days of the receipt by Lender of a confirmation that the Pledged Collateral has been deposited with the Depository

Broker and shall be memorialized in a Closing Statement as example in the form of Exhibit 1 hereto, which is hereby incorporated by reference.

(b)   Where the Loan is repaid in full at maturity, Borrower shall be entitled to all of the appreciation in the FMV of the Collateral, if any.

(c)   For purposes of Section 2.1(o), the amount that Lender may make available under the Loan shall be calculated by multiplying (i) fifty-five percent (55%) of the Pledged Collateral by (ii) the FMV.

(d)   Lender reserves the right not to fund the Loan at any one time more than four and nine tenths of one percent (4.9%) of the total shares outstanding.

## 2.2   Interest Rate.

(a)   All outstanding amounts of the Loan shall bear an interest rate in an amount equal to three and four point nine tenths percent (3.49%) per year to be paid to Lender in quarterly installments and on the Maturity Date. Interest payment shall be collected in advance of the Loan and shall accrue daily both before and after any Event of Default, demand, court judgment, or arbitral award, and shall be calculated on the basis of the actual number of days elapsed and on the basis of a year of three hundred and sixty five (365) days (three hundred and sixty six (366) days in a leap year).

(b)   The first interest payment date for the Loan shall be due on the first Business Day of the third month following the applicable Closing Date and such payment shall be based on a quarter year, regardless of the actual number of days between the applicable Closing Date and the date such first interest payment is due. All subsequent payments (except otherwise noted herein) shall be due on the first Working Day of each third month thereafter for the Term defined in Section 2.5 (as such Term may be extended) until the Maturity Date.

(c)   Subject to Section 2.1, all interests due hereunder shall be paid in or its value determined in U.S. dollars and made by way of certified check, wire transfer or other immediately available funds as directed by Lender.

2.3   Prepayment. There shall be no prepayment ("Prepayment") of the Approved Loan Amount or of any interest due under the Loan permitted during the first twelve (12) months of the Term, except any

payments to be received pursuant to a Change in Collateral event. Borrower may prepay the Approved Loan Amount after the lock-up period of 1 year, but shall be subject to a two percent (2%) prepayment fee.

2.4    Fees.

(a)    **Loan Origination Fee**. Contemporaneous with the funding of the Loan by Lender, Borrower shall pay to Lender an agreed upon Loan origination fee ("Lender's Origination Fee") of three tenths percent (3%) of the Approved Loan Amount actually funded. Lender is authorized to automatically deduct such Origination Fee.

(b)    **Loan Maintenance Fee**. Borrower shall pay to Lender an annual maintenance fee ("Lender's Maintenance Fee") of five tenths percent (0.5%) of the Approved Loan Amount. Lender is authorized to deduct in advance the Maintenance Fee from the Approved Loan Amount for the first year and the same shall be paid by Borrower on each anniversary of the Loan thereafter for all the years constituting the Term of the Loan.

(c)    **Third Party Expenses**. Borrower agrees to bear all reasonable costs, fees, and out of pocket expenses that might arise in the course of enforcing, executing, and maintaining this Agreement. For the services provided, the Depository Broker will be entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Dedicated Depository Account(s). For the avoidance of doubt, the annual custodian management charge is exclusive of any transaction fee, personal income tax, and other administrative costs and fees. Such fee shall be nonrefundable and shall be paid one (1) year in advance. First year fee is deducted from the Loan proceeds.

(d)    **Break-Up Fee**. In the event that Borrower fails to deliver the Pledged Collateral after execution of this Agreement, then there shall be a Break-Up Fee equal to five percent (5%) of the FMV of the Approved Loan Amount. The Break-Up Fee, also known as Liquidated Damages Fee or Rescission Fee, is effective upon the due execution of this Agreement by both Parties, and shall be Lender's only claim against Borrower for damages as a result of Borrower's failure to deliver the Pledged Collateral to the Depository Broker. This five percent (5%) Break-Up Fee applies only to Borrower's failure to deliver the Pledged Collateral and does not apply to other Event(s) of Default, which are covered under Section 7 of this Agreement.

(6) Other Fees. Borrower shall pay for third party legal expenses and opinions to validate the stock legitimacy and transferability as well as costs associated with the transfer, if any.

2.5 Extra Loan Amount. In the event of an increase in the FMV of the Pledged Collateral, Borrower has the right to request that Lender increase the Approved Loan Amount at the same Loan to Value (LTV) as provided herein, at which time an amendment to this Agreement regarding additional funds to be provided will be incorporated. Lender will have sole discretion in determining whether to fund any additional funds in addition to the Approved Loan Amount, up to the full FMV of the Pledged Collateral at the time of the written request. Borrower may exercise this provision no more than once every six (6) months.

## 2.6 Term of the Loan and Maturity Date of Loan.

(a) The Loan shall mature, and the Approved Loan Amount together with all accrued interest thereon shall be due and payable, three (3) years subsequent to the occurrence of the Closing Date (the "Maturity Date" or "Maturity").

(b) The Maturity Date may be extended by the Lender if agreed to by the Lender in writing. A fee in the amount of two percent (2%) of the Approved Loan Amount (the "Extension Fee") shall be due and payable on the original Maturity Date if the Lender agrees to extend such Maturity Date at the prevailing annual interest rate at the time of extension.

(c) No later than sixty (60) calendar days prior to the Maturity Date, Borrower shall communicate to Lender in writing whether it intends to repay the Approved Loan Amount on the Maturity Date. No later than thirty (30) calendar days prior to the Maturity Date, Borrower shall provide proof of funds to repay the Approved Loan Amount plus any other obligations due to Lender (as detailed in Section 2.9) on the Maturity Date (the "Proof of Funds"). The provision of proof of funds can be a screenshot of Borrower's bank or securities account holdings, or a copy of bank or securities account statement sent to the Lender via email.

2.7 Closing. The Closing Date shall be no later than three (3) Business Days after the Verification Day, assuming the conditions to Lender's obligations set forth in Section 6 herein are satisfied. The balance payment ("Balance Payment") shall be paid within three (3) Business Days of the written receipt by Lender of a confirmation that the Pledged Collateral has been deposited with the Depository

Broker. The Balance Payment shall mean the Approved Loan Amount less any Origination Fee, costs, or expenses, if applicable and as set forth in the Closing Statement, not satisfied in cash by Borrower. The Balance Payment shall be settled (paid) to the account(s) designated per the following instructions:

| Bank/Institution Name | UBS AG , Singapore |
|---|---|
| Swift Code No/Routing Number | UBSWSGSG |
| Account Number | 0546-00865329 |
| Account Name | GUO HONGXIN |
| Address of Account | one Raffles Quay #50-01 North Tower Singapore 048583 |

2.8    **Payment of the Approved Loan Amount and Interest on Maturity Date.** Repayment of the Approved Loan Amount plus any other obligations due to Lender, including but not limited to interest due on the Approved Loan Amount, shall be made on the Maturity Date. If the overdue Approved Loan Amount and other obligations are not received by Lender within three (3) Business Days of the original due date, Lender will send a notice to Borrower advising Borrower that the Loan will terminate under the default provisions of this Agreement.

2.9    **Loan Termination and Redelivery of the Pledged Collateral.** This Agreement shall terminate when all of Borrower's obligations have been paid in full. Lender confirms and will maintain its full ability to return the Pledged Collateral, and all rights, benefits and interests in relation thereto ("Sunpower shares") at the FMP, to Borrower, free of any encumbrance within five (5) Business Days of Borrower's satisfaction of its obligations. Provided, however, that this Agreement shall be reinstated if any payment in respect of the obligations is rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be restored or returned by Lender for any reason. For the purpose of this Agreement, a return of identical securities means a return of the Pledged Collateral as modified as a result of any split-up, revision, reclassification, or other like change of the Pledged Collateral. Any cash or shares tendered to buy down the Loan as a result of a Valuation Event are subject to redelivery and shall become part of the Pledged Collateral. Lender confirms to return only Sunpower shares, and not shares of other companies nor cash nor other equivalents.

# SECTION 3

## NATURE OF LOAN AND THE PLEDGED COLLATERAL

3.1 Non-Recourse Loan. Lender agrees that it will at all times look only to the Pledged Collateral identified in this Agreement for payment of the obligations and will not make any claim or institute any action or proceeding against Borrower or any representatives, agents, successors, assigns, or affiliates of Borrower for any deficiency remaining after applying the Pledged Collateral.

3.2 Lender's Appointment of Depository Broker. Lender shall have the exclusive right to appoint a "Depository Broker" (a securities broker/dealer licensed in the local jurisdiction that receives and manages the Pledged Collateral) for the purpose of receiving and possessing the Pledged Collateral.

# SECTION 4

## REPRESENTATIONS AND WARRANTIES OF BORROWER

Borrower represents and warrants to Lender that:

4.1 Capacity. Borrower has sole legal and equitable title to the Pledged Collateral or as corporate officer or director, Borrower has good and lawful authority to deliver all of the Pledged Collateral in the manner hereby contemplated to the possession of Lender.

4.2 No Liens or Restrictions. As of the date of this Agreement, the securities constituting the Pledged Collateral are owned by Borrower free and clear of any Liens or contractual, statutory, or regulatory limitation or restriction of whatever nature; are in good standing in accordance with their country of issue; and are freely tradable and transferable securities. Borrower covenants that so long as the Loan or any obligations to Lender remain outstanding and unpaid, Borrower shall not create, assume, or suffer to exist any Lien of any kind upon any of the Pledged Collateral. Borrower further represents and warrants that the securities being pledged to Lender pursuant to this Agreement are unrestricted and free-trading and that they are outside of any holding period that might prohibit their disposition.

4.3 <u>Non-Reliance.</u> Borrower is not relying on Lender for purposes of trading in securities or retaining Lender to facilitate stock trades for the Borrower or on behalf of the Borrower. Borrower further represents and warrants that it has not relied, and that Lender has not made, any representation, advice, or recommendation with respect to securities, either directly or through publication. Borrower understands and concedes that Lender is not a broker-dealer under U.S. securities laws or any acts or regulations related thereto and that Lender is not engaging in the business of buying and selling securities for its own accounts or the accounts of others or facilitating trades or effecting transactions in the securities for the account of others.

Borrower further represents and warrants that it understands and agrees that only a registered broker-dealer can facilitate stock trades in accordance with Hong Kong Securities laws. It is the intent of the Parties that the Lender will only control and encumber the Pledged Collateral in accordance with this Agreement as inducement for the Lender to extend financing.

Borrower finally represents, warrants, and covenants that it has not entered into the subject Agreement to trade in stock or to circumvent the requirement that stock trades are only to be facilitated by a registered broker-dealer in accordance with applicable Hong Kong laws.

4.4 <u>Cooperation.</u> Borrower will cooperate in executing any document provided by Lender's Depository Broker and clearinghouse as required by applicable laws and regulations. Borrower further represents that it shall in good faith cooperate to facilitate this Loan transaction. This duty attaches upon the due execution of this Agreement and endures until its termination, whether by reason of Default or the fulfillment of all obligations thereunder. Willful failure to execute a document required or reasonably necessary in the course of this Agreement shall constitute an Event of Default.

4.5 <u>Professional/Accredited Investor.</u> Borrower is an accredited investor under Hong Kong law and understands and acknowledges that owning securities or borrowing against them creates uncertain and unpredictable risk which outcome may substantially reduce or collapse their value. Borrower understands that as a result of the risk associated with margining securities, borrower may lose all of the securities and their entire value. Borrower is versed in the knowledge of securities borrowing and the inherent risks such speculative activity may bring.

4.6 <u>Waiver.</u> Borrower will not seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement. Injunctive relief by Borrower or any interference by Borrower or central depository agency shall be an immediate

and an incurable default. Borrower will not interfere in any way or challenge the validly or enforceability of this Agreement and the same shall be a Breach thereof.

## SECTION 5

### REPRESENTATIONS AND WARRANTIES OF LENDER

Lender represents and warrants to Borrower that:

5.1    Short Selling, Trading, and Re-Pledging. Lender is not engaged and will not engage, directly or indirectly, in short selling any security by borrowing the shares from any entity or person and later buying shares in the same security, then returning the borrowed shares in an effort to make a profit. Nor will Lender re-pledge or hypothecate the shares to anyone. Lender will not sell or trade in the shares for any reason whatsoever unless disposition of the shares is warranted, assuming a default, Lender is not limited to provisions of Section 7.1 of this Agreement.

5.2    Material Event. The Parties acknowledge that the Lender may, from time to time, provide notifications to the Depository Broker directing it to sell, transfer to and from Borrower's Account(s) to Lender's accounts(s) or any third party's account(s) of Lender's choosing, withdraw, or redeem any funds or other property in Borrower's Account(s). However, Lender will not at anytime, under any circumstance sell the Pledged Collateral, unless in Lender's sole discretion, a foreseeable adverse Material Event would require Lender to do so, such as but not limited to death, resignation, or arrest of key executives (Guo Hongxin and Ma Ming) of the Issuer; restatement of earnings; bankruptcy or liquidation; criminal investigation by a regulatory authority; suspension of business or trade licenses of the Issuer; loss of material patent that accounts for more than fifty percent (50%) of the Issuer's sales; fire causing more than eighty percent (80%) damage to a main plant or other material catastrophically the events that would impact earnings and the value of the stock; major analyst(s)' credit rating downgrade of the Issuer; major employees layoff of the Issuer affecting more than fifty percent (50%) of staff; scandals; filing of a lawsuit potentially having a devastating impact on Issuer's earnings; media notification of money laundering or other illegal activities by key executives (Guo Hongxin and Ma Ming) of the Issuer; or invasion by police or other regulatory authorities confiscating the Issuer's records. For clarity purposes, Material Event mentioned herein does not include the events of default listed in section 7.1.

**53** <u>Dividends, Interest, and Other Distributions.</u> Upon maturity, Lender shall credit Borrower for all dividends, if any. No dividends will be credited to Borrower if they are not paid by issuer to the Depository Broker.

**5.4** <u>Voting Rights and Powers.</u> Borrower is entitled to exercise all voting or other such consensual rights and powers until the security interest is enforced. Lender will not exercise any voting or other such consensual rights or powers under the terms of this Master Loan Agreement.

**5.5** <u>Best Efforts Approach.</u> Despite stock market volatility and pricing fluctuations, best efforts will be employed by Lender to facilitate the funding of the Loan in its entirety.

# SECTION 6
## CONDITIONS TO LENDER'S OBLIGATIONS

**6.1** <u>Conditions Precedent.</u> The obligation of Lender to make the Loan is subject to the fulfillment of the following conditions precedent (to the satisfaction of Lender):

    (a)    The delivery of duly executed Master Loan Agreement and Power of Attorney;

    (b)    The delivery of the stock in electronic form representing the Pledged Collateral; and

    (c)    That all matters, documentations, and other instruments in connection with the Loan are satisfactory in form and substance to Lender and its counsel.

**6.2** <u>Market Conditions.</u> Should the Pledged Collateral experience a material Valuation Event or material change in average daily trading volume prior to funding, Lender shall have the right to cease the funding of the Loan until such circumstances are dissipated or cured. The Pledged Collateral to remain with Lender, unless the Borrower repays all outstanding loans and interest, if any; or the Borrower terminates this Agreement and no amounts of loans and interest are outstanding upon which in each case, the Lender must release and return the pledged collateral to the Borrower.

# SECTION 7

## EVENTS OF DEFAULT AND REMEDIES

7.1   Events of Default. An "Event of Default" shall exist if any one or more of the following occurs:

(a)   Failure by Borrower to pay the interest and applicable fees when due or the Approved Loan Amount when due or any other default in the performance of an obligation that is not cured within the applicable cure time; applicable cure time being 3 business days as mentioned under Section 2.8.

(b)   If any representation or warranty made or failed to be made by Borrower in this Agreement or in any other Loan Document shall prove to have been materially untrue or misleading;

(c)   If the class of securities provided as Pledged Collateral is delisted or trading is halted for more than three (3) consecutive Business Days by a regulatory agency or otherwise (both constituting an immediate and incurable Event of Default);

(d)   If Borrower makes a general assignment for the benefit of creditors or consent to the appointment of a receiver, liquidator, custodian, or similar official of all or substantially all of its properties, or any such official is placed in control of such properties;

(e)   A decrease in the daily trading volume of Issuer securities of more than fifty percent (50%) cumulatively for three (3) consecutive trading days below the average daily trading volume for Issuer securities for the three (3) month period preceding the Closing Date, and remains below for one (1) trading day after the trading day first falls below, then the Borrower shall within three (3) Business Days, without demand, automatically transfer to the Depository Broker a one-time top-up of shares or cash equal to fifteen percent (15%) of the original number of shares pledged for this Agreement herein and cure the deficiency; as long as Borrower shows evidence that share transfer instructions have been effected on their end within three (3) business days, Borrower should not be held liable if the share transfer takes more than three (3) Business Days to settle due to processing time required at the Custodian's end.

(f)   If the Loan Documents shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared null or void or the validity or enforceability thereof shall be contested by Borrower or by any other Person;

(g)     If a Valuation Event occurs and Borrower fails to cure such Valuation Event as provided herein. A Valuation Event shall mean that the current FMP of the Pledged Collateral has fallen to less than seventy five percent (75%) of the FMP used to calculate the Approved Loan Amount, as reflected by the average of the last sale price on three (3) consecutive Business Days on a national or international securities exchange (the "Default Floor"). If a Valuation Event occurs, then the Borrower shall within three (3) Business Days, without demand, automatically transfer to the Depository Broker a one-time top-up of shares or cash equal to fifteen percent (15%) more than the FMV and cure the deficiency; as long as Borrower shows evidence that share transfer instructions have been effected on their end within three (3) business days, Borrower should not be held liable if the share transfer takes more than three (3) Business Days to settle due to processing time required at the Custodian's end.

(h)     If Lender does not receive Borrower's written Proof of Funds under Section 2.6(e) no later than thirty (30) calendar days prior to the Maturity Date of the Loan; or

(i)     If the Issuer of the Pledged Collateral is notified by the appropriate regulatory agency that it is out of compliance or subject to sanction or restriction; or

(j)     If the Issuer of the Pledged Collateral experiences a material adverse event that would impact either its earnings, credit report rating, or underwriting recommendation.

7.2     **Lender's Remedy.** Lender shall not and will not have any recourse or remedy or any course of action against Borrower for Breach of this Agreement, other than occurrence of any of the foregoing Event(s) of Default, if not cured within the designated cure period, if applicable, shall terminate the Master Loan Agreement, result in acceleration of all Loan amounts, interest, expenses, and fees due thereunder, and cause the forfeiture of the Pledged Collateral. The Lender shall notify the Borrower in writing of the acceleration and the outstanding amounts owing to the Lender, whereupon the Borrower shall repay all such outstandings within three (3) business days (not subject to the lock-up period mentioned in Section 2.3) of the notice. Upon payment by the Borrower, Lender will return the Pledged Collateral to Borrower within five (5) business days of Borrower's repayment, and not forfeit the Pledged Collateral. For the avoidance of doubt, the Lender is entitled to enforce the Pledged Collateral after the delivery of the acceleration notice, but only to the extent of the amount owing by the Borrower to the Lender, if the Borrower does not pay within three (3) business days of receiving the acceleration notice.

## SECTION 8

### Arbitration in the Event of Dispute

8.1     Arbitration of Claims, Disputes, or Controversies. The Parties shall endeavor to settle any dispute, controversy, or claim arising out of or relating to this Agreement including the existence, validity, interpretation, performance, breach, termination thereof, or any dispute regarding non-contractual obligations arising out of or relating to it ("Dispute") first by direct negotiation between managing directors or similar senior executives within forty five (45) days after written notice has been sent by one Party to the other Party (the "Consultation Period"). However, if direct negotiation does not result in a resolution of the Dispute within the Consultation Period, then the Parties agree to submit to mandatory and exclusive arbitration administered by the Hong Kong International Arbitration Centre under the Hong Kong International Arbitration Centre Administered Arbitration rules in force when the Notice of Arbitration is submitted by three (3) arbitrators.  In such a case, each Party to the arbitration shall, in accordance with the said rules, appoint one (1) arbitrator and the arbitrators so appointed by the Parties shall in turn mutually select one (1) additional arbitrator. The place of arbitration shall be Hong Kong and the proceedings shall be conducted in the English language. The award shall be final and legally binding on the Parties and shall be subject to enforcement in any courts having jurisdiction over the Parties.

8.2     Governing Law. This Agreement and all Loan Documents delivered hereunder and any and all claims, controversies, and causes of action arising out of or relating to them shall be governed by the laws of the Hong Kong Special Administrative Region of the People's Republic of China, including its statutes of limitations, without giving effect to any conflict-of-laws rules that would result in the application of the laws of a different jurisdiction.

## SECTION 9

### Indemnity and Limitation of Liability

9.1     Neither party shall be liable for any indirect, incidental, opportunity loss, or consequential damages, including loss of revenue or profits or losses arising from its normal course of business, even if a Party has been advised of the possibility of such damages.

9.2    Borrower shall not hold Lender responsible for any fluctuations in the value of the Pledged Collateral that Borrower may experience during the pendency of the Loan.

## SECTION 10
## MISCELLANEOUS

10.1    Notices. All notices and communications to either of the Parties by the other shall be in writing, sent by overnight mail by a reputable commercial carrier or electronically and shall be deemed duly given on the earlier of the date the same is sent, if via electronic communications, or received, when deposited in the mail, postage prepaid, as follows:

If to Lender: AMERICA 2030 CAPITAL LIMITED

Attention: Mark Bentley, Director of Operations

Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central,

Sheung Wan, Hong Kong

bentley@America2030.com; +16232132500

If to Borrower: SUNPOWER BUSINESS GROUP PTE LTD

Attention: to below parties

| Name | Address | Email | Tel |
|------|---------|-------|-----|
| Guo Hongxin | No. 2111 Chengxin Avenue, High-tech Industrial Park, Jiangning District, Nanjing, Jiangsu, 211112, P.R. China | guohongxin1@vip.163.com | +8613801588096 |
| Xie Yu | | xieyucssc@aliyun.com | +8613801598802 |
| Xiong Hanqing | | camellia_87@vip.163.com | +8613815870050 |
| Zhong Zhan | | michaelzhong@vip.163.com | +8618021510998 |
| Ang Kay Tiong | 4 Shenton Way SGX Centre 2, #07-03, Singapore 068807 | angkt@stirlingcoleman.com | +6596793630 |
| Sherry Ng | 8 Shenton Way AXA Tower #25-02 Singapore 068811 | sherry.ng@swissasia-group.com | +6582822990 |

Either Party may designate by notice in writing to the other a new address to which notices, requests, and other communications hereunder shall be given.

10.2    Severability. If any of the provisions of this Agreement or in any of the Loan Documents is found by an arbitral tribunal and/or court of competent jurisdiction to be unlawful, then such provision is modified to meet legal conformity or, if impracticable, is stricken out entirely as if it were never included and the remainder of the terms and conditions contained in this Agreement or any of the Loan Documents shall continue to be in full force and effect.

10.3    Survival. Except as herein provided, all representations, warranties, and covenants made in this Agreement shall survive the execution, delivery, and termination of this Agreement.

10.4    Waivers. No waiver of any provision of this Agreement shall be effective unless agreed to in writing by the Parties. No course of dealing between Borrower and Lender shall operate as a waiver of any of the rights of the Parties under this Agreement with the exception of an action for injunctive relief, which shall not be permitted or attempted and shall be nullified upon application.

10.5    Gender and Number. Unless the context otherwise requires, when used herein, the singular includes the plural, and vice-versa, and the masculine includes the feminine and neuter, and vice-versa.

10.6    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

10.7    Confidentiality. This Agreement is to be kept confidential and is not to be reproduced in any manner whatsoever for persons other than the Parties hereto. Specifically, each Party agrees to maintain the confidentiality of the business, trade, finances, and methods ("Confidential Information") of the other Party and not disclose the Confidential Information to any person other than those whose knowledge is essential for the performance of the Loan Documents. Lender will not reveal the existence of this Agreement to the media or any regulatory body or government agency, unless ordered to do so by court of law.

10.8    Force Majeure. Notwithstanding any provision of this Agreement, neither Party shall be liable for its inability in performing any of its obligations hereunder if such inability is caused by or arises as a result of circumstances beyond its reasonable control ("Force Majeure Event"). For the purposes of this Clause, a Force Majeure Event shall include, without limitation, inability or delay in performance caused

through acts of God, fire, flood, riot, degradation in stock value, stock market crash, illiquidity of the stock and other adverse market conditions, lightning, explosion, civil commotion, malicious damage, storm, tempest, electronic malfunctions, acts or omissions of telecommunications carriers, acts of government or other regulatory authority, acts or omissions of persons or bodies for whom the Party affected thereby is not responsible, and any other circumstances beyond the reasonable control of the relevant Party.

The Party affected by the Force Majeure Event shall promptly notify the other Party of the estimated extent and duration of such inability to perform its obligations hereunder. This Agreement shall remain in force until such time that the affected Party can perform.

10.9    Assignment. This Agreement cannot be assigned nor transferred by a Party without the prior written consent of the other Party. Such consent shall not be unreasonably withheld.

10.10   Entire Agreement. This Agreement contains the entire agreement between the Parties hereto and is legally binding upon them as of the date of the execution hereof.

10.11   Amendments. Amendments to this Agreement (including the adding or updating of any annexes, appendices, or schedules) shall not be effective unless in writing and signed by authorized signatories on behalf of both Parties.

10.12   Disclaimer. IT IS MUTUALLY UNDERSTOOD AND AGREED THAT LENDER HAS FINANCIAL INTEREST AND PRIVILEGE IN THE PLEDGED SHARES PURSUANT TO THE PARTIES' UNDERSTANDING AND CONTRACTUAL AGREEMENT. BORROWER HAS NOT AND WILL NOT RELY ON ANY MARKETING MATERIAL OR STATEMENTS OF MATERIAL FACT MADE BY SALES AGENTS OR LENDER PRIOR TO, DURING, OR FOLLOWING THE CLOSING OF THIS TRANSACTION. ALL SUCH STATEMENTS AND MARKETING MATERIAL ARE HEREBY PURGED FROM THIS LOAN AGREEMENT AS THOUGH NO MARKETING MATERIAL EVER EXISTED OR STATEMENTS OF MATERIAL FACT WERE EVER MADE. BORROWER ATTESTS THAT, AT ALL TIMES, IT WAS REPRESENTED BY LEGAL COUNSEL AND/OR BORROWER HAS HAD AMPLE OPPORTUNITY TO CONSULT ONE. BORROWER'S DECISION IS AT WILL AND SOLELY BASED ON ITS INDEPENDENT JUDGMENT. BORROWER HAS NOT BEEN DECLARED BY ANY COURT OF LAW TO BE INCOMPETENT OR OF NOT SOUND MIND. BORROWER IS FREE OF ANY EXTERNAL

INFLUENCE OF OTHERS OR INFLUENCE OF DRUGS OR ALCOHOL WHEN CONSIDERING OR ENTERING INTO THIS AGREEMENT. BORROWER'S MIND IS FREE OF INFLUENCES OF DURESS, BODILY THREATS, TORTURE, KIDNAPING, EXTORTION, OR COERCION. BORROWER HAS EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY LENDER, IF ANY. BORROWER UNDERSTANDS THAT MARKET CONDITIONS OR FORCE MAJEURE MAY CAUSE LENDER TO ADVANCE THE LOAN IN DISBURSEMENTS OR POSTPONE FUNDING. LENDER AGREES TO FOLLOW THE TRUTH IN LENDING ACT AND DOES NOT DISCRIMINATE ON THE BASIS OF SEX, RACE, NATIONALITY, OR RELIGION. BORROWER ASSUMES THE BURDEN OF TOPPING UP WHEN REQUIRED TO DO SO. BORROWER IS AWARE THAT MARKET CONDITIONS MAY CAUSE THE VALUE OF SECURITIES TO DECLINE. BORROWER CONCEDES THAT LENDER IS NOT RESPONSIBLE FOR THE DEGRADATION OF THE STOCK VALUE, WHETHER OWING TO AN ACTION(S) OR INACTION(S) OF LENDER. A DECLINE IN VALUE MAY REQUIRE ADDITIONAL SECURITIES OR CASH TO INCREASE THE VALUE OF THE COLLATERAL. A DEFAULT WILL CAUSE FORFEITURE OF SECURITIES. INJUNCTIVE RELIEF APPLICATION BY BORROWER AND ANY INTERFERENCE BY THE DEPOSITORY AGENCY ARE NOT ALLOWED. BORROWER HEREBY WAIVES AND FOREVER DISCHARGES LENDER AGAINST ANY AND ALL CLAIMS UNDER SECURITIES LAWS. TAX CONSEQUENCES ARE THE RESPONSIBILITY OF BORROWER. WHETHER AS A RESULT OF DEFAULT OR OTHERWISE, LENDER IS AUTHORIZED TO CONVERT COLLATERAL IN ORDER TO PROTECT LENDER'S INTEREST AND INDUCE LENDER TO PROVIDE FINANCING. BORROWER MAY OR MAY NOT TOP-UP IN THE EVENT OF A DROP IN VALUE OF COLLATERAL BUT WAIVES ITS RIGHT TO ASSERT A CLAIM OF CONVERSION, SINCE LENDER MAY TRANSACT AT ANY TIME IN SAID PLEDGED COLLATERAL AND MAY DO SO IN ORDER TO FUND THE LOAN. LENDER RESERVES THE RIGHT TO TEST THE PLEDGED COLLATERAL FOR VALIDITY AND EFFICACY AND SELL PRIOR TO FUNDING. LENDER HAS THE PRIVILEGE TO SAID PLEDGED COLLATERAL AND LENDER IS NOT ESTOPPED FROM ASSERTING ITS RIGHTS TO SAID COLLATERAL IN ACCORDANCE WITH LENDER'S RISK MANAGEMENT POLICY AND IN ORDER TO PROTECT ITS INTERESTS. LENDER AND ITS LOAN OFFICERS HAVE NOT PROVIDED LEGAL OR TAX ADVICE OF ANY KIND TO BORROWER. BORROWER IS TO CONSULT A TAX PROFESSIONAL FOR ANY TAX ADVICE. NEITHER BORROWER NOR LENDER HAVE RECEIVED A KICK-BACK OR BRIBE OF ANY KIND IN ORDER TO INDUCE LENDER TO PROVIDE A FINANCING FACILITY. LENDER IS NOT A BROKER-DEALER OR FINANCIAL ADVISOR. THIS DISCLOSURE PROVIDES FULL TRANSPARENCY OF RISKS

INVOLVED. LENDER IS NOT COMPENSATED BY ANY THIRD PARTY. NEITHER BORROWER NOR LENDER WILL PARTICIPATE IN OR ENGAGE IN ANY MONEY LAUNDERING SCHEME. THERE ARE NO PENDING NOR HAVE THERE BEEN ANY LAWSUITS OF ANY TYPE AGAINST LENDER IN ANY JURISDICTION OR COUNTRY. LENDER HAS NEVER BEEN SANCTIONED NOR FINED BY ANY AUTHORITY OR JURISDICTION. LENDER DOES NOT PROVIDE INVESTMENT ADVICE AND ITS LOAN OFFICERS AND SALES STAFF ARE PROHIBITED FROM DOING SO. BORROWER MUST INSURE THAT THE PLEDGED COLLATERAL STAYS WITHIN LENDER'S VALUE REQUIREMENT IN ACCORDANCE WITH THE MASTER LOAN AGREEMENT. LENDER WILL NOT BE LIABLE FOR DEVALUATION OF SECURITIES DURING THE TERM OF THE LOAN. LENDER IS NOT AN INSIDER OF THE SECURITIES BEING PLEDGED BY BORROWER AND LENDER DOES NOT AND HAS NOT OFFERED TO BUY OR SELL ADVICE TO BORROWER. LENDER MAY EXERCISE DOMINION OVER THE PLEDGED COLLATERAL IN ACCORDANCE WITH THIS AGREEMENT. BORROWER CONCEDES TO LENDER'S RIGHT TO TRANSACT IN THE PLEDGED COLLATERAL. A DEFAULT OF THE LOAN WILL CANCEL LENDER'S OBLIGATION TO BORROWER. BORROWER WILL NOT USE LOAN PROCEEDS FOR ANY ILLEGAL ACTIVITY, INCLUDING WITHOUT LIMITATIONS, USE OF LOAN PROCEEDS IN DRUG TRADE OR SUPPORT OF TERRORIST GROUPS. BORROWER WILL NOT TRANSACT WITH ANY ENTITY ON ANY INTERNATIONAL SANCTIONED LIST. LENDER IS NOT AFFILIATED WITH ANY GOVERNMENT AGENCY. BORROWER AGREES THAT THE LOAN IS SUITABLE FOR BORROWER'S NEEDS. LENDER HAS THE RIGHT, BUT NOT THE OBLIGATION, TO REFINANCE OR INCREASE LOAN AMOUNT IF THE VALUE OF SECURITIES INCREASE DURING THE TERM OF THE LOAN. BORROWER HAS RISK-TOLERANCE AND HAS FINANCIAL ABILITY AND LIQUID ASSETS TO POST MARGIN IN THE EVENT OF DEFAULT. BORROWER REPRESENTS THAT IT IS NOT AFFILIATED WITH ANY U.S. STOCK EXCHANGE. BORROWER REPRESENTS THAT BORROWER HAS FULL OWNERSHIP OF THE SECURITIES AND LEGAL CUSTODY AND AS OF THE DATE OF THIS AGREEMENT, IS NOT A DEFENDANT IN ANY LAWSUIT WHERE THE OWNERSHIP AND CONTROL OF THE PLEDGED SHARES ARE CHALLENGED BECAUSE LENDER WILL NOT BE A PARTY TO ANY SUCH CHALLENGE.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the day and year written below. It is specifically agreed and understood that this Agreement shall not be binding upon the Parties until the date it is actually signed by Lender and Borrower, and that shall be the effective date of this Agreement.

**BORROWER:**

SUNPOWER BUSINESS GROUP PTE LTD

Signature

Guo Hongjin, Director

Name and Title

June 4. 2018

Date

**LENDER:**

AMERICA 2030 CAPITAL LIMITED

Signature

VAL SKLAROV, MANAGING PARTNER

Name and Title

JUNE 12, 2018

Date

**EXHIBIT 1**
**CLOSING STATEMENT**

_____, 2018

Re:      Master Loan Agreement (the "MLA") by and between SUNPOWER BUSINESS GROUP PTE LTD ("Borrower") and AMERICA 2030 CAPITAL LIMITED ("Lender").

On _____, 2018, you delivered and posted shares of SUNPOWER GROUP LTD (SPWG:SP) to Lender's Account pursuant to the MLA, calculated based upon a fifty-five percent (55%)

LIV. The Loan proceeds, based on current stock price, are to be distributed to Borrower on the Closing Date under the MLA as follows:

| | | |
|---|---|---|
| Approved Loan Amount: | $_____ | USD |
| Lender's Origination Fee: | 3% | USD |
| Lender's Maintenance Fee: | 0.5% per annum | USD |
| Third Party Expenses: | $[●] | USD |
| Lender's Legal Expenses: | $15,000.00 | USD |
| Lender's Processing Fee: | $3,500.00 | USD |
| Balance Payment to Borrower: | $[●] | USD |

The Balance Payment will be settled (paid) to your account on the Closing Date per the instructions provided in Section 2.7 of the MLA. Specifically, to the following:

| Bank/Institution Name | UBS AG. Singapore |
|---|---|
| Swift Code No. | UBS WSGSG |
| Account Number | 0546 - 00865329 |
| Account Name | GUO HONG XIN |
| Address of Account | one Raffles Quay # 50- of North Tower Singapore 048583 |

### WITNESS

The foregoing instrument was acknowledged before me this _4th_ day of _June_, 2018,

by _Su, Qiyi_          (name) Legal & Compliance Manager (occupation). He/she is personally known to me

or has produced _____ as identification.

$\mathcal{J}_{\mathcal{J}}$ 3Ño

SIGNATURE OF WITNESS

*Contacts:*

USA

America 2030 Capital, LLC
1301 Shiloh RD, NW
Suite 1231
Kennesaw, GA 30144

United
Kingdom

America 2030 Capital Limited
Kemp House
160 City Road
London, United Kingdom
EC1V 2NX

Hong Kong

America 2030 Capital Limited
Unit 1411, 14/Floor Cosco Tower,
183 Queen's Road Central, Sheung
Wan, Hong Kong

www.america2030.net     ©1986-2018 All rights reserved.

# AMERICA **2030** CAPITAL LIMITED

## Investment Banking/Stock Loans

### IRREVOCABLE POWER OF ATTORNEY

By

**SUNPOWER BUSINESS GROUP PTE LTD, as Principal**

And

**AMERICA 2030 CAPITAL LIMITED, as Attorney In Fact**

DATED   Of   2018

## POWER OF ATTORNEY

THIS IRREVOCABLE POWER OF ATTORNEY is granted as of this___day of_____,2018
By SUNPOWER BUSINESS GROUP PTE LTD, for itself, representatives, affiliates, and assigns, with a
principal place of business located at 55 Lorong L Telok Kurau, 3-63 Bright Centre, Singapore 425500
(hereinafter, the "Principal"), which represents and warrants that they have the capacity and standing to
grant AMERICA 2030 CAPITAL LIMITED (hereinafter, the "Attorney In Fact") this Power of
Attorney, as the holder of the securities trading account no. [_____] located at:

Name of Subject Account:

Name of Depository Broker:

Address of Depository Broker:

| Authorized Director Acting on Behalf of Attorney In Fact | Specimen Signature |
|---|---|
| Name: Val Sklarov or Mark Bentley<br><br>Address: Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central, Sheung Wan, Hong Kong<br><br>Phone: +1 (623) 213-2500<br><br>Email: val@america2030.net<br>       bentley@america2030.net | |

## 1.    SCOPE OF AUTHORITY

The Attorney In Fact's scope of authority includes, but is not limited to: its ability to have access
to, receive, and enquire about the information pertaining to the depository account(s)
("Depository Account(s)" or "Account(s)"); place, revise, or cancel orders for sales and
purchase of securities; deposit, withdraw, and transfer funds or securities to and from the
Attorney In Fact's account(s) or any third party account(s) of the Attorney In Fact's choosing;
request advancement of the proceeds of securities transactions; execute all contracts and other
documents necessary for use of the services and/or products provided by the Depository Broker in
relation to the Account(s); close the Account(s); and exercise all rights and privileges and

perform all duties and obligations which may now or in the future pertain to the Principal as holder of the Account.

## 2. PRINCIPAL's REPRESENTATION

The Principal acknowledges that the Attorney In Fact may, from time to time, provide notifications to the Depository Broker directing it to sell, transfer to and from the Principal's Account(s) to any third party's account(s) of the Attorney In Fact's choosing, withdraw, or redeem any funds or other property in the Principal's Depository Account(s). However, the Attorney In Fact will not at anytime, under any circumstance sell the Pledged Collateral, unless in the Attorney In Fact's sole discretion, a foreseeable adverse Material Event would require the Attorney In Fact to do so, such as but not limited to death, resignation, or arrest of key executives; restatement of earnings; bankruptcy or liquidation; criminal investigation by a regulatory authority; suspension of business or trade licenses; loss of material patent that accounts for more than fifty percent (50%) of company sales; fire causing more than eighty percent (80%) damage to a main plant or other material catastrophic events that would impact earnings and the value of the stock; major analyst(s)' credit rating downgrade; major employees layoff effecting more than fifty percent (50%) of staff; scandals; filing of a lawsuit potentially having a devastating impact on company earnings; media notification of money laundering or other illegal activities by key executives; or invasion by police or other regulatory authorities confiscating company records. For clarity purposes, Material Event mentioned herein refers to the events described under Section 5.2 of the Master Loan agreement and does not include the events of default listed in section 7.1 of the Master Loan Agreement.

## 3. WAIVER

The Principal hereby unconditionally and irrevocably relinquishes, forfeits, and renounces any right it may now or in the future have over the Depository Account(s) to the Attorney In Fact. The Principal shall not claim any right or privilege or exercise any control whatsoever over the Account(s) and shall not issue any instructions to the Depository Broker or directly or indirectly interfere with the Attorney In Fact's instructions to said Depository Broker or attempt to seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Irrevocable Power of Attorney.

4.    **PRINCIPAL RATIFIES ATTORNEY'S IN FACT ACTS**

The Principal ratifies and confirms whatever the Attorney In Fact lawfully does or purports to do pursuant to the authority granted to it by this Irrevocable Power of Attorney.

5.    **DEPOSITORY BROKER INDEMNITY**

The Principal acknowledges that the Principal is responsible for, and bound by, the instructions that the Attorney In Fact gives the Depository Broker and does hereby indemnify, discharge, and forever hold harmless the Depository Broker in relation to the actions of the Attorney In Fact and will not take any action or seek remedy against the Depository Broker with respect to it complying with and enforcing this Irrevocable Power of Attorney.

6.    **INDEPENDENT LEGAL SIGNIFICANCE**

This Irrevocable Power of Attorney is of independent legal significance and incorporates the rights, waivers, and obligations of the Master Loan Agreement ("MLA"). To the extent that the provisions of this Irrevocable Power of Attorney conflicts with the MLA, this Irrevocable Power of Attorney governs.

7.    **EFFECTIVENESS**

This Power of Attorney is hereby made Irrevocable by the Principal and shall remain in full effect until such time as the Attorney In Fact revokes it by providing a certified board resolution to the Depository Broker to effect the termination of the authority granted to the Attorney In Fact under this Irrevocable Power of Attorney.

8.    THE PRINCIPAL REPRESENTS THAT THE SECURITIES AND OR PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY ILL-GOTTEN GAIN OR A RESULT OF ANY FRAUDULENT ACTIVITY WHICH WILL FALL UNDER HONG KONG PENAL LAW. THE PRINCIPAL IS NOT UNDER THE INFLUENCE OF DRUGS OR ALCOHOL WHEN GRANTING THIS IRREVOCABLE POWER OF ATTORNEY. THE PRINCIPAL HAS NOT BEEN DECLARED BY A COURT OF LAW TO BE MENTALLY INCOMPETENT. THE SUBJECT SHARES AND PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY PENDING LITIGATION AND ARE FREE OF ANY LIEN OR ENCUMBRANCE. THE PRINCIPAL ORDERS AND MANDATES THE DEPOSITORY BROKER THAT IRRESPECTIVE OF HOW THIS IRREVOCABLE POWER

OF ATTORNEY MAY BE INTERPRETED, ANY AND ALL ENTITLEMENT ORDERS SHALL COME SOLELY FROM THE ATTORNEY IN FACT AND SHALL NOT BE CONTESTED. THE PARTIES HAVE EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY THE ATTORNEY IN FACT. THE DEPOSITORY BROKER SHALL BE FULLY INDEMNIFIED BY THE PRINCIPAL AGAINST ANY LIABILITIES OCCASIONED BY THIS IRREVOCABLE POWER OF ATTORNEY.

As of this date, the Attorney In Fact will become and is hereby designated as the sole and exclusive authority over the subject Depository Account(s). This Power of Attorney takes effect on the date first stated above.

For and on behalf of Principal

Signature

Guo HongXin

Full Name

June 4 2018

Date

WITNESS:

The foregoing instrument was acknowledged before me this 4th day of June, 2018,
by Sia, Qiuj (name) legal of compliance (occupation). He/she is personally known to me
or has produced _____ as identification.

Signature of Witness

| USA | America 2030 Capital, LLC<br>1301 Shiloh RD. NW<br>Suite 1231<br>Kennesaw, GA. 30144 |
| --- | --- |
| United Kingdom | America 2030 Capital Limited<br>Kemp House<br>160 City Road<br>London, United Kingdom<br>EC1V 2NX |
| Hong Kong | America 2030 Capital Limited<br>Unit 1411, 14/Floor Cosco Tower, 183<br>Queen's Road Central, Sheung Wan, Hong<br>Kong |

# AMERICA 2030 CAPITAL LIMITED

## Investment Banking/Stock Loans

CUSTODIAN MANAGEMENT AGREEMENT

Between

SUNPOWER BUSINESS GROUP PTE LTD, as Borrower;

AMERICA 2030 CAPITAL LIMITED, as Lender;

And

[●], as Depository Broker

DATED _____ of _____ 2018

**Custodian Management Agreement**

This Custodian Management Agreement (this "Agreement" or the "CMA") is entered into, effective on the date of execution hereof, by and between:

SUNPOWER BUSINESS GROUP PTE LTD for itself, representatives, affiliates, and assigns, with a principal place of business located at 55 Lorong L Telok Kurau, 3-63 Bright Centre, Singapore 425500, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("Borrower");

AMERICA 2030 CAPITAL LIMITED, for itself, representatives, affiliates, and assigns, with an office located at Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central, Sheung Wan, Hong Kong, which represents and warrants that they have the capacity and standing to enter into this Agreement, hereinafter referred to as ("Lender");

And

_____ for itself, affiliates, and subsidiaries, with a principal place of business located at_____, and represented by_____,which represents and warrants that they have the capacity and standing to enter into this Agreement (hereinafter "Depository Broker").

Borrower, Lender, and Depository Broker are hereinafter sometimes individually referred to as a "Party" and collectively as the "Parties".

1    Scope of this Agreement.

1.1    Lender and Borrower have entered into a Master Loan Agreement (the "MLA"), which is independent of this Agreement and the Depository Broker is not bound by it, may not interpret or attempt to adhere to it, shall not base Lender's entitlement order ("Entitlement Order") on it, shall not refuse to follow Lender's Entitlement Order, or attempt to interfere with any such Entitlement Order.

2    Control By Lender.

2.1    The Parties acknowledge that the Lender may, from time to time, provide notifications to the Depository Broker directing it to sell, transfer to and from Borrower's

Account(s) to any third party's account(s) of Lender's choosing, withdraw, or redeem any funds or other property in Borrower's Depository Account(s). However, Lender will not at anytime, under any circumstance sell the Pledged Collateral, unless in Lender's sole discretion, a foreseeable adverse Material Event would require Lender to do so, such as but not limited to death, resignation, or arrest of key executives; restatement of earnings; bankruptcy or liquidation; criminal investigation by a regulatory authority; suspension of business or trade licenses; loss of material patent that accounts for more than fifty percent (50%) of company sales; fire causing more than eighty percent (80%) damage to a main plant or other material catastrophic events that would impact earnings and the value of the stock; major analyst(s)' credit rating downgrade; major employees layoff affecting more than fifty percent (50%) of staff; scandals; filing of a lawsuit potentially having a devastating impact on company earnings; media notification of money laundering or other illegal activities by key executives; or invasion by police or other regulatory authorities confiscating company records. For clarity purposes, Material Event mentioned herein refers to the events described under Section 5.2 of the Master Loan agreement and does not include the events of default listed in section 7.1 of the Master Loan Agreement.

2.2    The Depository Account(s) held by the Depository Broker in favor of Lender are as follows:

| List of the Dedicated Depository Account(s) (Maintained by the Borrower with the Depository Broker Specifying Account Name, Signatory, Address, and Account Number): | |
|---|---|
| | |
| | |
| | |
| | |

2.3    The Lender's lien and security interest also includes all proceeds of the foregoing, and all proceeds of proceeds and trades. Borrower represents and warrants to both Lender and the Depository Broker that it owns the Pledged Collateral free and clear of any lien, whether voluntary or involuntary.

2.4    The Borrower agrees to bear all reasonable costs, fees, and out of pocket expenses that might arise in the course of enforcing, executing, and maintaining this Agreement.

2.5 For the services provided, the Depository Broker will be entitled to an annual custodian management charge to be paid by Borrower based on the cumulative net asset value of all Depository Account(s). For the avoidance of doubt, the annual custodian management charge is exclusive of any transaction fee, personal income tax, and other administrative costs and fees. Such nonrefundable fee shall be paid one year in advance. First year fee shall be deducted from the Loan proceeds.

2.6 Borrower hereby agrees to unconditionally and irrevocably relinquish, forfeit, and renounce any right it may now or in the future have over the Depository Account(s) to the Lender. Borrower shall not claim any right or privilege or exercise any control whatsoever over the Account(s) and shall not issue any instructions to the Depository Broker or directly or indirectly interfere with Lender's instructions to said Depository Broker or attempt to seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement. Any attempt for Injunctive relief by Borrower or any interference by central depository agency shall be an immediate and an incurable default.

3 Borrower's Rights in the Dedicated Depository Account(s).

3.1 Until the Lender notifies the Depository Broker in writing that the Lender's security interest in the Depository Account(s) have terminated, the Depository Broker shall not distribute to the Borrower any securities, assets, funds, or property currently or in the future held in the Depository Account(s) whatsoever.

4 Depository Broker's Responsibility.

4.1 The Depository Broker shall immediately notify the Lender of the receipt of the Pledged Collateral into the Depository Account(s), including the amount of shares deposited, the stock price at the time of receipt, and confirmation that the Account(s) is now solely under the custody, care, and control of the Lender.

4.2 The Depository Broker will not be liable to the Borrower for complying with any Entitlement Orders originated by the Lender and the Borrower hereby waives any rights to claims against the Depository Broker in connection thereto. Further, it is agreed that the Depository Broker is

not obliged to verify and will not verify whether Lender has the right to give the Entitlement Order.

5    Indemnity.

5.1   Borrower acknowledges that Borrower is bound by the instructions that the Lender gives the Depository Broker and does hereby indemnify, discharge, and forever hold harmless the Depository Broker, its officers, directors, employees, agents, and shareholders in relation to the actions of the Lender and will not take any action or seek remedy against the Depository Broker with respect to it complying with and enforcing this Agreement.

6    Termination.

6.1   Lender may at any time terminate this Agreement on not less than thirty (30) days written notice to the Depository Broker and the Borrower. The Depository Broker may terminate this Agreement on not less than thirty (30) days written notice to the Lender and the Borrower. Upon such termination by the Depository Broker, the Lender shall within two (2) Business Days issue an Entitlement Order to the Depository Broker ordering the Depository Broker to promptly transfer the Pledged Collateral to the Lender or to such person(s) under the written instructions issued by or on behalf of the Lender. Once a transfer is made pursuant to such Entitlement Order, the Depository Broker's obligations under this Agreement are or deemed to have been fully discharged.

7    Miscellaneous.

7.1   Borrower may not assign, transfer, charge, or novate any of its rights or obligations under this Agreement.

7.2   Capitalized terms used but not defined herein shall have the meanings given to such terms in the MLA.

7.3   All communications from and to any of the Parties hereto may be transmitted by mail to the addresses listed below or electronically and shall, in the case of the latter, have full legal force and effect, including electronic signatures contained therein.

Lender:

AMERICA 2030 CAPITAL LIMITED

Attention: Val Sklarov, Director and CEO

Unit 1411, 14/Floor Cosco Tower, 183 Queen's Road Central,

Sheung Wan, Hong Kong

val@America2030.net +1 623-213-2500

Borrower:

SUNPOWER BUSINESS GROUP PTE LTD

Attention: to below parties

| Name | Address | Email | Tel |
|------|---------|-------|-----|
| Guo Hongxin | | guohongxin1@vip.163.com | +8613801588098 |
| Xie Yu | No. 2111 Chengxin Avenue, High-tech Industrial Park, Jiangning District, Nanjing, Jiangsu, 211112, P.R. China | xieyucssc@aliyun.com | +8613801588802 |
| Xiong Hanqing | | camellia_87@vip.163.com | +8613815870050 |
| Zhong Zhan | | michaelzhong@vip.163.com | +8618021510998 |
| Ang Kay Tiong | 4 Shenton Way SGX Centre 2, #07-03, Singapore 088807 | angkt@stirlingcoleman.com | +6596793630 |
| Sherry Ng | 8 Shenton Way AXA Tower #25-02 Singapore 068811 | sherry.ng@swissasia-group.com | +6582822990 |

Depository Broker:

_____

_____

7.4 BORROWER REPRESENTS THAT THE SECURITIES AND OR PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY ILL-GOTTEN GAIN OR A RESULT OF ANY FRAUDULENT ACTIVITY WHICH WILL FALL UNDER HONG KONG PENAL LAW. BORROWER IS NOT UNDER THE INFLUENCE OF DRUGS OR ALCOHOL WHEN ENTERING INTO THIS AGREEMENT. BORROWER HAS NOT BEEN DECLARED BY A COURT OF LAW TO BE MENTALLY INCOMPETENT. THE SUBJECT SHARES AND PROPERTY IN THE DEPOSITORY ACCOUNT(S) ARE NOT PART OF ANY PENDING LITIGATION AND ARE FREE OF ANY LIEN OR ENCUMBRANCE. BORROWER ORDERS AND MANDATES THE DEPOSITORY BROKER THAT

IRRESPECTIVE OF HOW THIS AGREEMENT MAY BE INTERPRETED, ANY AND ALL ENTITLEMENT ORDERS SHALL COME SOLELY FROM LENDER AND SHALL NOT BE CONTESTED. THE PARTIES HAVE EVALUATED ALL RISKS INDEPENDENTLY AND DID NOT RELY ON REPRESENTATIONS MADE BY LENDER. THE DEPOSITORY BROKER SHALL BE FULLY INDEMNIFIED BY BORROWER AGAINST ANY LIABILITIES OCCASIONED BY THIS AGREEMENT.

**SIGNATORIES**

Depository Broker: (Include Chop)

| | | |
|---|---|---|
| Signature | Name and Title | Date |

Borrower: (Include Chop)

Gro Houghtin Director.        June 4, 2018

Name and Title        Date

NOTARY PUBLIC

Notary Public is only certifying Borrower's signature

Lender: (Include Chop)

VAL SKLGROV        JUNE 10, 2018

Name and Title MONOGILG MEMBER Date

NOTARY PUBLIC

Notary Public is only certifying Lender's signature



**Contacts:**

USA

America 2030 Capital LLC
1100 Snhol RD. NW
Suite 1231
Kennesaw, GA 30144

UNITED KINGDOM

America 2030 Capital Limited
Kemp House
160 City Road
London, United Kingdom
EC1V 2NX

HONG KONG

America 2030 Capital Limited
Unit 1411, 14 Floor, Cosco Tower
183, Queen's Road, Central, Sheung
Wan, Hong Kong

www.america2030.net     ©1986-2018 All rights reserved.

# EXHIBIT C

AMERICA 2030 CAPITAL LIMITED
Hamilton Development, Unit B
Charlestown, Nevis
Federation of St.Kitts & Nevis

November 9, 2018

Guo Hongxin, Xie Yu, Xiong Hanqing
Zhong Zhan, Ang Kay Tiong, Sherry Ng
Sunpower Business Group PTE LTD
No. 2111 Chengxin Avenue
High-Tech Industrial Park
Jiangning District, Nanjing
Jiangsu, 211112, China

Via Email

### DEFAULT AND FORFEITURE NOTICE

Sunpower Business Group PTE LTD ("Sunpower") executed a Master Loan Agreement ("MLA") on June 4th, 2018. Amongst various covenants, terms, provisions and obligations made by Sunpower, a default and forfeiture of the Pledged Collateral was provided for, in the event Sunpower breached the MLA and defaulted.

On October 2nd, 2018 Sunpower was notified via FedEx Global that it is not meeting the terms and conditions of the MLA and is in default and Sunpower was sent a "Default and Acceleration Notice."

To date, Sunpower has failed to respond to the "Default and Acceleration Notice" and satisfy the default as stipulated in Section 7.2 of the MLA, which states: that Borrower is obligated to satisfy "outstanding amounts owing to Lender, whereupon the Borrower shall repay all such outstandings within three (3) business days of the notice." Failure to pay amounts owed within three (3) business days of the date of this letter will trigger forfeiture of the Pledged Collateral, which constitutes fourteen million shares (14M) of Sunpower Group LTD ("SPWG") trading on the Singapore stock exchange.

Section 7 of the MLA stipulates that "if trading is halted for more than three (3) days by a regulatory agency or otherwise, it shall be an immediate and incurable default. SPWG had not traded on Monday November 5th, 2018, on Tuesday November 6th, 2018, on Wednesday November 7th, 2018, on Thursday November 8, 2017.

Further, the MLA states that if there is any interference by the Borrower or Central Depository agency, with the Depository Broker holding the subject SPWG shares of the Pledge Collateral, that it shall be an immediate and incurable default.

Sunpower did just that, interfered with the Depository Broker, the Clearing Agency and the Central Depository interfered with the Depository Broker by sending letters and demanding that shares be frozen. The inquiries by the Singapore Central Depository were made on behalf of Sunpower. Further, Sunpower through its counsel had sent a letter dated November 8, 2018 to Mellon Omnibus demanding

that shares be frozen and requesting and stating that the MLA be terminated. Such inquiries on behalf of Sunpower questioned the validity and enforceability of the MLA, interfered with the MLA and sought to "declare null and void" the MLA.

Section 4.6 of the MLA states: "Borrower will not seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement. Injunctive relief by Borrower or any interference by Borrower or central depository agency shall be an immediate and an incurable default. Borrower will not interfere in any way or challenge the validity or enforceability of this Agreement and same shall be a breach thereof."

Sunpower has sought injuctive relief on or about November 8, 2018, in breach of the MLA.

Section 7.1 (b) of the MLA states: "If any representation or warranty made or failed to be made by Borrower in this Agreement or in any other Loan Document shall prove to have been materially untrue or misleading."

Section 7.1 (f) of the MLA states: If the Loan Document shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared null and void or the validity or enforceability thereof shall be contested by the Borrower or by any other Person."

Borrower mislead the Lender in to believing that the Lender would be entitled to a "Break-Up Fee" as a condition and consideration for entering in to the MLA. Borrower mislead the Lender in believing that injunctive relief would not be sought. Borrower mislead the Lender in to believing that Borrower will not interfere with the Depository Broker or Central Depository. Borrower mislead the Lender in to believing that sufficient collateral would be pledged for a $25M USD loan and subsequently renegotiated by Borrower to a $3M USD loan. At all times Borrower acted in bad faith in misleading the Lender of its intent to perform in accordance with the MLA, CMA and POA.

For the reasons stated below, the Pledged Collateral is subject to forfeiture:

a) Sunpower failed to satisfy the Break-Up Fee provision by failing to remitt the required funds to the Lender within the allotted time frame as stipulated in Section 7.2 of the MLA.
b) The Issuer of the SPWG securities halted trading for more than 3 days in breach of Section 7.1 (c).
c) The Central Depository on behalf of Sunpower and Sunpower interfered with the Depository Broker.
d) Borrower sought and filed for injunctive relief in breach of Section 4.6.
e) Borrower terminated the MLA in breach of Section 7.1 (f)
f) Borrower invalidated, suspended, limited, terminated and restricted the MLA.

In accordance with the MLA the Lender is invoking the forfeiture of the Pledged Collateral provision.

Section 10.3 of the MLA states: "Survival. Except as herein provided, all representations, warranties and covenants made in this Agreement shall survive the execution, delivery and termination of this Agreement."

The Dispute and Arbitration clause provides that there shall be forty five (45) day consultation period prior to the initiation of Arbitration. It is the Lenders position that such period has begun on November 2nd, 2018 when Sunpower was notified of the Default And Acceleration Notice, whereby Sunpower was offered to satisfy its obligation to the Lender by paying the Break-Up Fee.

On November 3rd 2018 and November 4th, 2018, the Lender and Sunpower representatives exchanged emails and the discussion of the Break-Up Fee was acknowledged, hence confirming that the 45 day consultation period has begun.

The Lender intends to file for Arbitration which will commence on or after December 17th, 2018 in accordance with the MLA and the Addendum executed between Sunpower and the Lender, which stipulates that Clause 8.1 of the MLA be amended to arbitrate in the event of dispute in St.Kitts and Nevis, administered by Arbitrator Conflict Resolution Service of St. Kitts and Nevis under arbitration rules of The Arbitrator Conflict Resolution Service of St.Kitts and Nevis and all such decisions and awards will be final and binding upon the parties.

Governing Law in the MLA was amended by the Addendum which stated: "Clause 8.2 will be amended to St.Kitts and Nevis and Hong Kong removed."

Therefore, the Arbitration will take place in the Federation of St.Kitts and Nevis as provided in the MLA and the Addendum which was executed by the respective Parties. The Lender intends to seek an award of breach and forfeiture of the Pledged Collateral.

Further, please be advised that according to Section 2.4 (c) of the MLA, the Borrower is responsible for all of Lenders costs in "enforcing, executing and maintaining this Agreement" and we will vigorously pursue and enforce all terms and conditions under the MLA, including reimbursement for Lenders legal fees.

This Notice is being sent via email to all of the parties listed in the MLA in the notice section.

Sincerely,

Val Sklarov
Operations Manager

AMERICA 2030 CAPITAL LIMITED
Hamilton Development, Unit B
Charlestown, Nevis
Federation of St.Kitts & Nevis

November 9, 2018

Ma Ming, Xie Yu, Xiong Hanqing
Zhong Zhan, Ang Kay Tiong, Sherry Ng
Sunpower Business Group PTE LTD
No. 2111 Chengxin Avenue
High-Tech Industrial Park
Jiangning District, Nanjing
Jiangsu, 211112, China

Via Email

### DEFAULT AND FORFEITURE NOTICE

Sunpower Business Group PTE LTD ("Tournan") executed a Master Loan Agreement ("MLA") on June 4th, 2018. Amongst various covenants, terms, provisions and obligations made by Tournan, a default and forfeiture of the Pledged Collateral was provided for, in the event Tournan breached the MLA and defaulted.

On October 2nd, 2018 Tournan was notified via FedEx Global that it is not meeting the terms and conditions of the MLA and is in default and Tournan was sent a "Default and Acceleration Notice."

To date, Tournan has failed to respond to the "Default and Acceleration Notice" and satisfy the default as stipulated in Section 7.2 of the MLA, which states: that Borrower is obligated to satisfy "outstanding amounts owing to Lender, whereupon the Borrower shall repay all such outstandings within three (3) business days of the notice." Failure to pay amounts owed within three (3) business days of the date of this letter will trigger forfeiture of the Pledged Collateral, which constitutes fourteen million shares (14M) of Sunpower Group LTD ("SPWG") trading on the Singapore stock exchange.

Section 7 of the MLA stipulates that "if trading is halted for more than three (3) days by a regulatory agency or otherwise, it shall be an immediate and incurable default. SPWG had not traded on Monday November 5th, 2018, on Tuesday November 6th, 2018, on Wednesday November 7th, 2018, on Thursday November 8, 2017.

Further, the MLA states that if there is any interference by the Borrower or Central Depository agency, with the Depository Broker holding the subject SPWG shares of the Pledge Collateral, that it shall be an immediate and incurable default.

Tournan did just that, interfered with the Depository Broker, the Clearing Agency and the Central Depository interfered with the Depository Broker by sending letters and demanding that shares be frozen. The inquiries by the Singapore Central Depository were made on behalf of Tournan. Further, Tournan through its counsel had sent a letter dated November 8, 2018 to Mellon Omnibus demanding

that shares be frozen and requesting and stating that the MLA be terminated. Such inquiries on behalf of Tournan questioned the validity and enforceability of the MLA, interfered with the MLA and sought to "declare null and void" the MLA.

Section 4.6 of the MLA states: "Borrower will not seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Agreement. Injunctive relief by Borrower or any interference by Borrower or central depository agency shall be an immediate and an incurable default. Borrower will not interfere in any way or challenge the validity or enforceability of this Agreement and same shall be a breach thereof."

Tournan has sought injuctive relief on or about November 8, 2018, in breach of the MLA.

Section 7.1 (b) of the MLA states: "If any representation or warranty made or failed to be made by Borrower in this Agreement or in any other Loan Document shall prove to have been materially untrue or misleading."

Section 7.1 (f) of the MLA states: if the Loan Document shall, at any time after their execution and delivery for any reason, cease to be in full force and effect or shall be declared null and void or the validity or enforceability thereof shall be contested by the Borrower or by any other Person."

Borrower mislead the Lender in to believing that the Lender would be entitled to a "Break-Up Fee" as a condition and consideration for entering in to the MLA. Borrower mislead the Lender in believing that injunctive relief would not be sought. Borrower mislead the Lender in to believing that Borrower will not interfere with the Depository Broker or Central Depository. Borrower mislead the Lender in to believing that sufficient collateral would be pledged for a $25M USD loan and subsequently renegotiated by Borrower to a $3M USD loan. At all times Borrower acted in bad faith in misleading the Lender of its intent to perform in accordance with the MLA, CMA and POA.

For the reasons stated below, the Pledged Collateral is subject to forfeiture:

a) Tournan failed to satisfy the Break-Up Fee provision by failing to remitt the required funds to the Lender within the allotted time frame as stipulated in Section 7.2 of the MLA.
b) The issuer of the SPWG securities halted trading for more than 3 days in breach of Section 7.1 (c).
c) The Central Depository on behalf of Tournan and Tournan interfered with the Depository Broker.
d) Borrower sought and filed for injunctive relief in breach of Section 4.6.
e) Borrower terminated the MLA in breach of Section 7.1 (f)
f) Borrower invalidated, suspended, limited, terminated and restricted the MLA.

In accordance with the MLA the Lender is invoking the forfeiture of the Pledged Collateral provision.

Section 10.3 of the MLA states: "Survival. Except as herein provided, all representations, warranties and covenants made in this Agreement shall survive the execution, delivery and termination of this Agreement."

The Dispute and Arbitration clause provides that there shall be forty five (45) day consultation period prior to the initiation of Arbitration. It is the Lenders position that such period has begun on November 2nd, 2018 when Tournan was notified of the Default And Acceleration Notice, whereby Tournan was offered to satisfy its obligation to the Lender by paying the Break-Up Fee.

On November 3rd 2018 and November 4th, 2018, the Lender and Tournan representatives exchanged emails and the discussion of the Break-Up Fee was acknowledged, hence confirming that the 45 day consultation period has begun.

The Lender intends to file for Arbitration which will commence on or after December 17th, 2018 in accordance with the MLA and the Addendum executed between Tournan and the Lender, which stipulates that Clause 8.1 of the MLA be amended to arbitrate in the event of dispute in St.Kitts and Nevis, administered by Arbitrator Conflict Resolution Service of St. Kitts and Nevis under arbitration rules of The Arbitrator Conflict Resolution Service of St.Kitts and Nevis and all such decisions and awards will be final and binding upon the parties.

Governing Law in the MLA was amended by the Addendum which stated: "Clause 8.2 will be amended to St.Kitts and Nevis and Hong Kong removed."

Therefore, the Arbitration will take place in the Federation of St.Kitts and Nevis as provided in the MLA and the Addendum which was executed by the respective Parties. The Lender intends to seek an award of breach and forfeiture of the Pledged Collateral.

Further, please be advised that according to Section 2.4 (c) of the MLA, the Borrower is responsible for all of Lenders costs in "enforcing, executing and maintaining this Agreement" and we will vigorously pursue and enforce all terms and conditions under the MLA, including reimbursement for Lenders legal fees.

This Notice is being sent via email to all of the parties listed in the MLA in the notice section.

Sincerely,

Val Sklarov
Operations Manager

# EXHIBIT D



## ARBITRATION APPLICATION

DECEMBER 21, 2015

THE ARBITRATOR

P O Box 2477 Basseterre St Kitts

# ARBITRATION APPLICATION

## IN THE MATTER OF AN ARBITRATION BY AGREEMENT OF THE PARTIES

### AND

### (The Arbitration Act, Cap. 3.01)

**TO:**

    The Arbitrator

    Address:

    Phone:

    Fax:

    Email:

## PARTIES TO THIS ARBITRATION

**BETWEEN:**

    Party 1                                                      (the "Claimant")

               America 2030 Capital Limited

    *Address for service:*  Hamilton Development, Unit B. Charlestown, Nevis.

    Phone: 1-623-213-2500,     Email: Val@America2030.net

    AND

    **MR. GUO HONGXIN**                                1st Respondent

    No. 2111 Chengxin Avenue

    High-Tech Industrial Park

    Jiangning District Nanjing

Jiangsu 211112, P.R. China

Phone: +86-138-01588-098.      Email: guohongxin1@vip.163.com

**SUNPOWER BUSINESS GROUP PTE LTD**                                2nd Respondent

55 Lorong L Telox Kurau

# 3 – 63 Bright Centre

Singapore, Singapore. 425500

Phone: +86-138-01588-098      Email: guohongxin1@vip.163.com

(collectively referred to as "the Parties")

WHEREAS the Parties have agreed to refer to arbitration certain disputes arising between them, AND have agreed that such arbitration shall be conducted by The Arbitrator Conflict Resolution Centre in St. Kitts & Nevis, the Claimant now indicates and make application as follows:

## I.      NATURE OF DISPUTE

The Applicant ("Petitioner") claims against the Respondents both jointly and severally.

At all material times the first Respondent was an agent, servant, representative and/or employee of the second Respondent and in doing the things alleged herein the first Respondent was acting within the scope of his authority and with the permission, knowledge and consent of the second Respondent.

That Mr. Guo Hongxin committed fraud and defamed Petitioner by misrepresenting facts to High Court of Singapore that America 2030 transferred shared from account of Sunpower Business Group PTE LTD without authority.

That Mr. Guo Hongxin committed fraud and defamed Petitioner by releasing multiple false public announcements with intent to harm Petitioner through defamation by accusing Petitioner publicly of wrong doing.

That Mr. Guo Hongxin committed a tort by defaming and slandering America 2030 publicly and through media that it acted improperly, illegally and that America 2030's conduct with was without authorization.

That Mr. Guo Hongxin communicated to Shentonwire that his shares "Appear to go missing", and Shenton published such an article, implying wrongdoing by Petitioner.

That it's impossible to measure and quantify the extent of irreparable harm and damage caused by Mr. Guo Hongxin, executive of Sunpower Group LTD and Sunpower Business Group PTE LTD.

That America 2030 has a worldwide client base and Mr. Guo Hongxin caused the release of false public announcements which have caused severe damage to America 2030 reputation, disruption in business and loss of income.

That Mr. Guo Hongxin knew, should have known or had reasonable knowledge to know that the public announcements and representations to Singapore High Court were false and misleading and were made with malice to cause harm to Petitioner and were in breach of the Master Loan Agreement ("MLA"), the Custodian Management Agreement ("CMA") and the Power of Attorney ("POA") executed by Mr. Guo Hongxin, who represented in the MLA to have consulted an attorney with respect to its contents and was represented by legal counsel prior to execution of the MLA and throughout the entire time a business relationship existed between Petitioner and Respondent .

That Respondent acted with reckless disregard of the truth and falsified facts in order to damage and tarnish Petitioners business and reputation in order to benefit Respondent and his public company.

That Mr. Guo Hongxin was served with a "Default Notice" on November the 2nd, 2018 whereby he was told the basis of the Default, but he went ahead in total disregard of the facts, failed to reach out to Petitioner to question the Default Notice, and instead made false announcements and engaged in feverish letter writing campaign to refute facts and defame Petitioner.

That Respondent acted negligently in failing to ascertain whether the statements he made were true or false before making them, when at all times the Respondent had documents which contradicted the statements he chose to make publicly and to others.

That as a result of false announcements made by Mr. Guo Hongxin, executive of Sunpower Business Group PTE LTD , America 2030 is being approached by media for comments who further sensationalize the misinformation announced by Sunpower Group LTD, a public entity controlled by Mr. Guo Hongxin.

That Mr. Guo Hongxin is wrongfully representing to media, Singapore High Court, Singapore Central Depository, Depository Broker and CIBC Mellon, that the pledged collateral transferred to the absolute, sole and irrevocable control of America 2030 is under some sort of a "trust", implying that America 2030 breached a fiduciary duty to Respondent. In none of the documents executed between Mr. Guo Hongxin and America 2030 is there any reference to any type of "trust". There has never existed any type of a "trust" and there was none implied in any contracts.

That Mr. Guo Hongxin is an executive of a Singapore public company, Sunpower Group LTD and Mr. Guo Hongxin as an top executive of a public company is held to a higher

standard it knowing the ramifications and consequences of false public announcements in an effort to mislead the public.

That Mr. Guo Hongxin sought to blame Petitioner in media for the poor performance of securities of Sunpower Group LTD.

That such false announcements were intentionally released when Mr. Guo Hongxin knew, should have known and had reason to know, were false, slanderous and constitute libel.

That false announcements released or caused to be released by Mr. Guo Hongxin disrupted Petitioners business and caused it to lose clients and income.

That Mr. Guo Hongxin acted with malice and reckless disregard of the truth in releasing or causing to release false announcements and disrupting Petitioners business.

That Mr. Guo Hongxin himself and through his attorneys obtained ex-parte Injunctive Relief from Singapore High Court, in violation of the MLA, CMA & POA which explicitly prohibit Injunctive relief application.

That Mr. Guo Hongxin himself and through his attorneys interfered with the Singapore Central Depository, the Depository Broker as well as CIBC Mellon, the Custodian of securities by providing or causing to be provided to such entities false, slanderous and defamatory statements aimed to discredit and tarnish Petitioners reputation and standing.

That on multiple occasions, Mr. Guo Hongxin had the propensity to exhibit wanton disregard for the validity and existence of the MLA, CMA and POA which he executed on June 4th, 2018.

On June 4th, 2018 Mr. Guo Hongxin executed an "Irrevocable Power of Attorney" granting all rights, title, chattel and dominion to America 2030 Capital Limited (Attorney in Fact), a Hong Kong entity, and by reassignment to America 2030 Capital Limited, a Nevis entity.

The POA, amongst other things states the following in Section 1:
"The Attorney in Facts scope of authority includes, but is not limited to: its ability to have access to, receive, and enquire about the information pertaining to the depository account(s) ("Depository Account(s)" or Accounts(s); place, revise, or cancel orders for sales and purchase of securities; deposit, withdraw and transfer funds or securities to and from the Attorney In Fact's account(s) or any third party account(s) of the Attorney in Fact's choosing; request advancement of the proceeds of securities transactions; execute all contracts and other documents necessary for use of the services and/or products provided by the Depository Broker in relation to the Account(s); close the Account(s); and exercise all rights and privileges and perform all duties and obligations which may now or in the future pertain to the Principal as holder of the Account."

In Section 3 of the POA, it states the following:
"The Principal hereby unconditionally and irrevocably relinquishes, forfeits and renounces any right it may now or in the future have over the Depository Account(s) to the Attorney In fact. The Principal shall not claim any right or privilege or exercise any control whatsoever over the Account(s) and shall not issue instructions to the Depository Broker or directly or indirectly interfere with the Attorney In Fact's instructions to said Depository Broker or attempt to seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Irrevocable Power of Attorney."

Section 5 of the POA states:
"The Principal acknowledges that the Principal is responsible for, and bound by, the instructions that the Attorney In Fact gives the Depository Broker........."

Section 6 of the POA states:
"This Irrevocable Power of Attorney is of independent legal significance and incorporates the rights, waivers, and obligations of the Master Loan Agreement ("MLA"). To the extent that the provisions of this Irrevocable Power of Attorney conflicts with the MLA, this Irrevocable Power of Attorney governs."

Section 7 of the POA states:
"This Power of Attorney is hereby made Irrevocable by the Principal and shall remain in full effect until such time as the Attorney In Fact revokes it by providing a certified board resolution to the Depository Broker to effect the termination of the authority granted to the Attorney In fact under this Irrevocable Power of Attorney."

Section 8 of the POA in ALL CAPS states amongst other things:
"THE PRINCIPAL ORDERS AND MANDATES THE DEPOSITORY BROKER THAT IRRESPECTIVE OF HOW THIS IRREVOCABLE POWER OF ATTORNEY MAY BE INTERPRETED, ANY AND ALL ENTITLEMENT ORDERS SHALL COME SOLELY FROM THE ATTORNEY IN FACT AND SHALL NOT BE CONTESTED."

The Custodian Management Agreement ("CMA") repeats and re-incorporates the same covenants as above and further states in Section 2.3:
"The Lender's lien and security interest also includes all proceeds of the foregoing, and all proceeds of proceeds and trades."

Section 2.4 of the CMA states:
"The Borrower agrees to bear all reasonable costs, fees, and out of pocket expenses that might arise in the course of enforcing, executing, and maintaining this Agreement."

Section 5.1 of the CMA states:

"Borrower acknowledges that Borrower is bound by the instructions that the Lender gives the Depository Broker and does hereby indemnify, discharge, and forever hold harmless the Depository Broker, its officers, directors, employees, agents, and shareholders in relation to the actions of the Lender and will not take any action or seek remedy against the Depository Broker with respect to it complying with and enforcing this Agreement."

The MLA signed by Respondent on June 4th, 2018 states in the Disclaimer Section in all caps, amongst other things, the following:

1) "A DEFAULT WILL CAUSE FORFEITURE OF SECURITIES"

2) "BORROWER MAY OR MAY NOT TOP-UP IN THE EVENT OF A DROP IN VALUE OF COLLATERAL, BUT WAIVES ITS RIGHT TO ASSERT A CLAIM OF CONVERSION, SINCE LENDER MAY TRANSACT AT ANY TIME IN SAID PLEDGED COLLATERAL AND MAY DO SO IN ORDER TO FUND THE LOAN'

3) "LENDER RESERVES THE RIGHT TO TEST THE PLEDGED COLLATERAL FOR VALIDITY AND EFFICACY AND SELL PRIOR TO FUNDING"

4) "LENDER HAS THE PRIVILEDGE TO SAID PLEDGED COLLATERAL AND LENDER IS NOT ESTOPPED FROM ASSERTING ITS RIGHTS TO SAID COLLATERAL IN ACCORDANCE WITH LENDER'S RISK MANAGEMENT POLICY AND IN ORDER TO PROTECT ITS INTERESTS"

5) "LENDER MAY EXERCISE DOMINION OVER THE PLEDGED COLLATERAL IN ACORDANCE WITH THIS AGREEMENT"

6) "BORROWER CONCEDES TO LENDERS RIGHT TO TRANSACT IN THE PLEDGED COLLATERAL"

7) "A DEFAULT OF THE LOAN WILL CANCEL LENDER'S OBLIGATION TO BORROWER"

That irrespective of the existence of the MLA, POA and CMA granting America 2030 Capital Limited, the irrevocable dominion, chattel and sole irrefutable control over fourteen million (14M) shares of Sunpower Group LTD to sell, trade, convert or transfer the securities, the respondent had released, multiple public announcements disregarding and refuting the existence of the MLA, POA and CMA and claiming that America 2030 Capital Limited acted wrongfully, illegally and improperly, in an effort to discredit America 2030 Capital Limited and cause it malicious harm in the eyes of the public at large and relevant third parties.

Further roof supporting the damage caused by Respondent will be provided during the arbitration.

The Petitioner has and is suffering mental pain, duress, humiliation and a loss of reputation and credibility. The Petitioner is in the finance business and depends on trust and credibility in order to stay in business. Respondents defamatory statements and malicious actions have prevented and interfered with Petitioners business and livelihood and Petitioner will continue to suffer for years to come.

II.   **JURISDICTION**

The Parties agreed to arbitration under and by virtue of an agreement made between them on the 4th day of June, 2018 and agreed that the arbitrator would have jurisdiction to determine all matters, disputes, controversies, claims disputes arising out of the said contract a copy of which is attached to this application.

III.   **THE REMEDIES SOUGHT**

The amount in controversy is cash proceeds from the sale of some of the 14 million (14M) shares of Sunpower Group LTD (SPWG:SP) as well as remaining securities, which are and at all times were under the sole and exclusive control of Petitioner. Respondent needs to be held accountable and bear responsibility for the false, reckless and malicious announcements and letter writing campaign he engaged in, without disregard to the damage such would cause the Petitioner in light of the existence of the MLA, CMA and POA which gave rise and full authority for Petitioner to act in accordance with such agreements.

It is impossible to quantify the damage caused by the false public announcements made by Mr. Guo Hongxin and by the false and malicious letters written for and on behalf of Respondent to various entities and the loss of business which Petitioner has suffered and will continue to suffer for years to come. The Petitioner is seeking remedies at ten (10) times the amount in controversy in cash and/or securities and ten (10) times for punitive damages in cash and/or securities or any other sum that the arbitrator may find appropriate in respect of general damages, exemplary damages and punitive damages to the extent allowed by law.

That Respondent be ordered to release a public announcement apologizing, recanting the previous announcements and admitting that Respondent was wrong in the previously released announcements. That respondent be ordered to write a letter to Mellon Omnibus, the Singapore Central Depository and to Bahamas Securities Regulators withdrawing the previously written letters and setting forth new facts that America 2030 did in fact act in accordance with its contractual obligations and that Respondent incorrectly erred in issuing the previous letters. All such letters and public announcements are to be first approved by Petitioner, prior to their release and distribution.

That Respondent be ordered to withdraw its injunctive relief obtained through the Singapore High Court by representing to the Singapore High Court that he erred by the application of the injunctive relief and that facts presented to the High Court in the injunctive relief petition were false and erroneous.

Exemplary and Punitive damages to the extent allowed by law.

All costs and fees incurred in pursuing this claim.

Such other and further relief as the arbitrator may deem appropriate.

## IV.    VALUE OF THE CLAIM

At the center of the dispute are cash proceeds and securities of SPWG:SP, which originally when turned over to Petitioners control, comprised of fourteen (14M) million shares. Petitioner is seeking ten (10) times that amount for actual damages (in cash and/or securities), pain and suffering, mental anguish and loss of business, and ten (10) times that amount (in cash and/or securities) for punitive damages.

## V.    COMMENCEMENT FEE

The commencement fee in the amount of $550.00 has been paid.

_NOV 27, 2018_

**Date**

**Signature of the Claimant**



## ARBITRATION APPLICATION

DECEMBER 21, 2015

THE ARBITRATOR

P.O. Box 2477, Basseterre, St. Kitts

# ARBITRATION APPLICATION

## IN THE MATTER OF AN ARBITRATION BY AGREEMENT OF THE PARTIES

### AND

### (The Arbitration Act, Cap. 3.01)

TO:

    The Arbitrator

    Address:

    Phone:

    Fax:

    Email:

## PARTIES TO THIS ARBITRATION

BETWEEN:

    Party 1                                       (the "Claimant")

                    America 2030 Capital Limited

    *Address for service:*  Hamilton Development, Unit B. Charlestown, Nevis.

    Phone: 1-623-213-2500,    Email: Val@America2030.net

    AND

    **MR. MA MING**                                   1st Respondent

    No. 2111 Chengxin Avenue

    High-Tech Industrial Park

    Jiangning District Nanjing

Jiangsu 211112, P.R. China

Phone: +86-138-01588-068.     Email: frankma@vip.163.com


**TOURNAN TRADING PTE LTD**                              2nd Respondent

55 Lorong L Telox Kurau

# 3 – 63 Bright Centre

Singapore, Singapore. 425500

Phone: +86-138-01588-068     Email: frankma@vip.163.com


(collectively referred to as "the Parties")


WHEREAS the Parties have agreed to refer to arbitration certain disputes arising between them, AND have agreed that such arbitration shall be conducted by The Arbitrator Conflict Resolution Centre in St. Kitts & Nevis, the Claimant now indicates and make application as follows:


I.      **NATURE OF DISPUTE**

The Applicant ("Petitioner") claims against the Respondents both jointly and severally.

At all material times the first Respondent was an agent, servant, representative and/or employee of the second Respondent and in doing the things alleged herein the first Respondent was acting within the scope of his authority and with the permission, knowledge and consent of the second Respondent.

That Mr. Ma Ming committed fraud and defamed Petitioner by misrepresenting facts to High Court of Singapore that America 2030 transferred shared from account of Tournan Trading PTE LTD without authority.

That Mr. Ma Ming committed fraud and defamed Petitioner by releasing multiple false public announcements with intent to harm Petitioner through defamation by accusing Petitioner publicly of wrong doing.

That Mr. Ma Ming committed a tort by defaming and slandering America 2030 publicly and through media that it acted improperly, illegally and that America 2030's conduct was without authorization.

That Mr. Ma Ming communicated to Shentonwire that his shares "Appear to go missing", and Shenton published such an article, implying wrongdoing by Petitioner.

That it's impossible to measure and quantify the extent of irreparable harm and damage caused by Mr. Ma Ming, executive of Sunpower Group LTD and Tournan Trading PTE LTD.

That America 2030 has a worldwide client base and Mr. Ma Ming caused the release of false public announcements which have caused severe damage to America 2030 reputation, disruption in business and loss of income.

That Mr. Ma Ming knew, should have known or had reasonable knowledge to know that the public announcements and representations to Singapore High Court were false and misleading and were made with malice to cause harm to Petitioner and were in breach of the Master Loan Agreement ("MLA"), the Custodian Management Agreement ("CMA") and the Power of Attorney ("POA") executed by Mr. Ma Ming, who represented in the MLA to have consulted an attorney with respect to its contents and was represented by legal counsel prior to execution of the MLA and throughout the entire time a business relationship existed between Petitioner and Respondent .

That Respondent acted with reckless disregard of the truth and falsified facts in order to damage and tarnish Petitioners business and reputation in order to benefit Respondent and his public company.

That Mr. Ma Ming was served with a "Default Notice" on November the 2nd, 2018 whereby he was told the basis of the Default, but he went ahead in total disregard of the facts, failed to reach out to Petitioner to question the Default Notice, and instead made false announcements and engaged in feverish letter writing campaign to refute facts and defame Petitioner.

That Respondent acted negligently in failing to ascertain whether the statements he made were true or false before making them, when at all times the Respondent had documents which contradicted the statements he chose to make publicly and to others.

That as a result of false announcements made by Mr. Ma Ming, executive of Tournan Trading PTE LTD , America 2030 is being approached by media for comments who further sensationalize the misinformation announced by Sunpower Group LTD, a public entity controlled by Mr. Ma Ming.

That Mr. Ma Ming is wrongfully representing to media, Singapore High Court, Singapore Central Depository, Depository Broker and CIBC Mellon, that the pledged collateral transferred to the absolute, sole and irrevocable control of America 2030 is under some sort of a "trust", implying that America 2030 breached a fiduciary duty to Respondent. In none of the documents executed between Mr. Ma Ming and America 2030 is there any reference to any type of "trust". There has never existed any type of a "trust" and there was none implied in any contracts.

That Mr. Ma Ming is an executive of a Singapore public company, Sunpower Group LTD and Mr. Ma Ming as an top executive of a public company is held to a higher

3 | Page

standard it knowing the ramifications and consequences of false public announcements in an effort to mislead the public.

That Mr. Ma Ming sought to blame Petitioner in media for the poor performance of securities of Sunpower Group LTD.

That such false announcements were intentionally released when Mr. Ma Ming knew, should have known and had reason to know, were false, slanderous and constitute libel.

That false announcements released or caused to be released by Mr. Ma Ming disrupted Petitioners business and caused it to lose clients and income.

That Mr. Ma Ming acted with malice and reckless disregard of the truth in releasing or causing to release false announcements and disrupting Petitioners business.

That Mr. Ma Ming himself and through his attorneys obtained ex-parte Injunctive Relief from Singapore High Court, in violation of the MLA, CMA & POA which explicitly prohibit injunctive relief application.

That Mr. Ma Ming himself and through his attorneys interfered with the Singapore Central Depository, the Depository Broker as well as CIBC Mellon, the Custodian of securities by providing or causing to be provided to such entities false, slanderous and defamatory statements aimed to discredit and tarnish Petitioners reputation and standing.

That on multiple occasions, Mr. Ma Ming had the propensity to exhibit wanton disregard for the validity and existence of the MLA, CMA and POA which he executed on June 4th, 2018.

On June 4th, 2018 Mr. Ma Ming executed an "Irrevocable Power of Attorney" granting all rights, title, chattel and dominion to America 2030 Capital Limited (Attorney in Fact), a Hong Kong entity, and by reassignment to America 2030 Capital Limited, a Nevis entity.

The POA, amongst other things states the following in Section 1:
"The Attorney in Facts scope of authority includes, but is not limited to: its ability to have access to, receive, and enquire about the information pertaining to the depository account(s) ("Depository Account(s)" or Accounts(s); place, revise, or cancel orders for sales and purchase of securities; deposit, withdraw and transfer funds or securities to and from the Attorney in Fact's account(s) or any third party account(s) of the Attorney in Fact's choosing; request advancement of the proceeds of securities transactions; execute all contracts and other documents necessary for use of the services and/or products provided by the Depository Broker in relation to the Account(s); close the Account(s); and exercise all rights and privileges and perform all duties and obligations which may now or in the future pertain to the Principal as holder of the Account."

In Section 3 of the POA, it states the following:
"The Principal hereby unconditionally and irrevocably relinquishes, forfeits and renounces any right it may now or in the future have over the Depository Account(s) to the Attorney In fact. The Principal shall not claim any right or privilege or exercise any control whatsoever over the Account(s) and shall not issue instructions to the Depository Broker or directly or indirectly interfere with the Attorney In Fact's instructions to said Depository Broker or attempt to seek injunctive relief from any court of law, regulatory body or stock exchange requesting to invalidate, suspend, limit, impede, terminate or restrict this Irrevocable Power of Attorney."

Section 5 of the POA states:
"The Principal acknowledges that the Principal is responsible for, and bound by, the instructions that the Attorney In Fact gives the Depository Broker........."

Section 6 of the POA states:
"This Irrevocable Power of Attorney is of independent legal significance and incorporates the rights, waivers, and obligations of the Master Loan Agreement ("MLA"). To the extent that the provisions of this Irrevocable Power of Attorney conflicts with the MLA, this Irrevocable Power of Attorney governs."

Section 7 of the POA states:
"This Power of Attorney is hereby made Irrevocable by the Principal and shall remain in full effect until such time as the Attorney in Fact revokes it by providing a certified board resolution to the Depository Broker to effect the termination of the authority granted to the Attorney In fact under this Irrevocable Power of Attorney."

Section 8 of the POA in ALL CAPS states amongst other things:
"THE PRINCIPAL ORDERS AND MANDATES THE DEPOSITORY BROKER THAT IRRESPECTIVE OF HOW THIS IRREVOCABLE POWER OF ATTORNEY MAY BE INTERPRETED, ANY AND ALL ENTITLEMENT ORDERS SHALL COME SOLELY FROM THE ATTORNEY IN FACT AND SHALL NOT BE CONTESTED."

The Custodian Management Agreement ("CMA") repeats and re-incorporates the same covenants as above and further states in Section 2.3:
"The Lender's lien and security interest also includes all proceeds of the foregoing, and all proceeds of proceeds and trades."

Section 2.4 of the CMA states:
"The Borrower agrees to bear all reasonable costs, fees, and out of pocket expenses that might arise in the course of enforcing, executing, and maintaining this Agreement."

Section 5.1 of the CMA states:
"Borrower acknowledges that Borrower is bound by the instructions that the Lender gives the Depository Broker and does hereby indemnify, discharge, and forever hold harmless the Depository Broker, its officers, directors, employees, agents, and

5 | P a g e

shareholders in relation to the actions of the Lender and will not take any action or seek remedy against the Depository Broker with respect to it complying with and enforcing this Agreement."

The MLA signed by Respondent on June 4th, 2018 states in the Disclaimer Section in all caps, amongst other things, the following:

1) "A DEFAULT WILL CAUSE FORFEITURE OF SECURITIES"

2) "BORROWER MAY OR MAY NOT TOP-UP IN THE EVENT OF A DROP IN VALUE OF COLLATERAL, BUT WAIVES ITS RIGHT TO ASSERT A CLAIM OF CONVERSION, SINCE LENDER MAY TRANSACT AT ANY TIME IN SAID PLEDGED COLLATERAL AND MAY DO SO IN ORDER TO FUND THE LOAN'

3) "LENDER RESERVES THE RIGHT TO TEST THE PLEDGED COLLATERAL FOR VALIDITY AND EFFICACY AND SELL PRIOR TO FUNDING"

4) "LENDER HAS THE PRIVILEDGE TO SAID PLEDGED COLLATERAL AND LENDER IS NOT ESTOPPED FROM ASSERTING ITS RIGHTS TO SAID COLLATERAL IN ACCORDANCE WITH LENDER'S RISK MANAGEMENT POLICY AND IN ORDER TO PROTECT ITS INTERESTS"

5) "LENDER MAY EXERCISE DOMINION OVER THE PLEDGED COLLATERAL IN ACORDANCE WITH THIS AGREEMENT"

6) "BORROWER CONCEDES TO LENDERS RIGHT TO TRANSACT IN THE PLEDGED COLLATERAL"

7) "A DEFAULT OF THE LOAN WILL CANCEL LENDER'S OBLIGATION TO BORROWER"

That irrespective of the existence of the MLA, POA and CMA granting America 2030 Capital Limited, the irrevocable dominion, chattel and sole irrefutable control over fourteen million (14M) shares of Sunpower Group LTD to sell, trade, convert or transfer the securities, the respondent had released, multiple public announcements disregarding and refuting the existence of the MLA, POA and CMA and claiming that America 2030 Capital Limited acted wrongfully, illegally and improperly, in an effort to discredit America 2030 Capital Limited and cause it malicious harm in the eyes of the public at large and relevant third parties.

Further roof supporting the damage caused by Respondent will be provided during the arbitration.

The Petitioner has and is suffering mental pain, duress, humiliation and a loss of reputation and credibility. The Petitioner is in the finance business and depends on trust and credibility in order to stay in business. Respondents defamatory statements and

malicious actions have prevented and interfered with Petitioners business and livelihood and Petitioner will continue to suffer for years to come.

## II.    JURISDICTION

The Parties agreed to arbitration under and by virtue of an agreement made between them on the 4th day of June, 2018 and agreed that the arbitrator would have jurisdiction to determine all matters, disputes, controversies, claims disputes arising out of the said contract a copy of which is attached to this application.

## III.    THE REMEDIES SOUGHT

The amount in controversy is cash proceeds from the sale of some of the 14 million (14M) shares of Sunpower Group LTD (SPWG:SP) as well as remaining securities, which are and at all times were under the sole and exclusive control of Petitioner. Respondent needs to be held accountable and bear responsibility for the false, reckless and malicious announcements and letter writing campaign he engaged in, without disregard to the damage such would cause the Petitioner in light of the existence of the MLA, CMA and POA which gave rise and full authority for Petitioner to act in accordance with such agreements.

It is impossible to quantify the damage caused by the false public announcements made by Mr. Ma Ming and by the false and malicious letters written for and on behalf of Respondent to various entities and the loss of business which Petitioner has suffered and will continue to suffer for years to come. The Petitioner is seeking remedies at ten (10) times the amount in controversy in cash and/or securities and ten (10) times for punitive damages in cash and/or securities or any other sum that the arbitrator may find appropriate in respect of general damages, exemplary damages and punitive damages to the extent allowed by law.

That Respondent be ordered to release a public announcement apologizing, recanting the previous announcements and admitting that Respondent was wrong in the previously released announcements. That respondent be ordered to write a letter to Mellon Omnibus, the Singapore Central Depository and to Bahamas Securities Regulators withdrawing the previously written letters and setting forth new facts that America 2030 did in fact act in accordance with its contractual obligations and that Respondent incorrectly erred in issuing the previous letters. All such letters and public announcements are to be first approved by Petitioner, prior to their release and distribution.

That Respondent be ordered to withdraw its injunctive relief obtained through the Singapore High Court by representing to the Singapore High Court that he erred by the application of the injunctive relief and that facts presented to the High Court in the injunctive relief petition were false and erroneous.

Exemplary and Punitive damages to the extent allowed by law.

All costs and fees incurred in pursuing this claim.

Such other and further relief as the arbitrator may deem appropriate.

IV.     VALUE OF THE CLAIM

At the center of the dispute are cash proceeds and securities of SPWG:SP, which originally when turned over to Petitioners control, comprised of fourteen (14M) million shares. Petitioner is seeking ten (10) times that amount for actual damages (in cash and/or securities), pain and suffering, mental anguish and loss of business, and ten (10) times that amount (in cash and/or securities) for punitive damages.

V.      COMMENCEMENT FEE

The commencement fee in the amount of $550.00 has been paid.

NOV 27 2018

Date                                      Signature of the Claimant

# EXHIBIT E



# SUNPOWER GROUP LTD.

---

**NOTICE OF LEGAL ACTION BY CERTAIN SUBSTANTIAL SHAREHOLDERS OF THE COMPANY AGAINST AMERICA 2030 CAPITAL LIMITED REGARDING COLLATERAL SHARES**

---

1.   **BACKGROUND**

1.1   Sunpower Group Ltd. (the "**Company**") refers to the trading halt that was called on 5 November 2018.

2.   **UNAUTHORISED TRANSFERS OF SHARES IN RELATION TO THE LOAN AGREEMENT ENTERED INTO BETWEEN TWO SUBSTANTIAL SHAREHOLDERS OF THE COMPANY AND AMERICA 2030 CAPITAL LIMITED**

2.1   The Company wishes to update its shareholders that it was informed on 3 November 2018 by Mr Guo Hongxin ("**Mr Guo**") and Mr Ma Ming ("**Mr Ma**") that (i) they had discovered that their 14 million ordinary shares each in the capital of the Company, which had been deposited in the Designated Account (as defined below) were no longer in the Designated Account (as defined below), (ii) Mr Guo and Mr Ma, through their respective wholly-owned subsidiaries, (collectively, the "**Borrowers**" and each a "**Borrower**") had entered into a loan agreement with America 2030 Capital Limited ("**America 2030**" or the "**Lender**") pursuant to which the Lender is to extend a loan ("**Loan**") to each Borrower and each Borrower has provided the Lender, on or about 17 October 2018, 14 million ordinary shares in the capital of the Company (representing approximately 1.89% of the total issued shares of the Company) as collateral ("**Collateral Shares**") to a depository broker designated by the Lender ("**Designated Account**"). The Loan, which has not been disbursed to the Borrowers, is for the Borrowers' personal use, and (iii) the Borrowers would be seeking legal advice and intend to commence legal proceedings against the Lender in respect of the Collateral Shares. Upon receipt of such information, a trading halt was called by the Company on 5 November 2018, to enable the Company to disclose material information in order to ensure and/or minimise the potential existence of a disorderly market arising from the foregoing.

2.2   By way of background, Mr Guo, our Executive Chairman, is interested in an aggregate of 147,716,554 ordinary shares in the capital of the Company (direct and indirect interest), representing approximately 19.98% of the total issued shares of the Company. Mr Ma, our Executive Director, is interested in an aggregate of 128,541,737 ordinary shares in the capital of the Company (direct and indirect interest), representing approximately 17.39% of the total issued shares of the Company.

3.   **ACTIONS TAKEN**

3.1   The Company has been given to understand that the Borrowers have, since the occurrence of the above:

     (a)   engaged legal advisors and have commenced legal proceedings in the Supreme Court of Singapore to seek the return of the Collateral Shares as the Collateral Shares (or part thereof) have been transferred or otherwise dealt in, between 25 October 2018 and 5 November 2018 without the authority of, consent by and/or notice to the Borrowers, and the Borrowers have a basis, albeit inconclusive, to suspect that these transfers

and/or dealings in were carried out on the instructions of America 2030, and to prevent the Collateral Shares from being transferred, sold or otherwise disposed of;

(b) on 8 November 2018, an order of the Court has been granted for *ex parte* interim injunction to restrain America 2030, its officers, employees, nominees, agents and/or depository brokers from selling, forfeiting, transferring and/or otherwise dealing in, or procuring the above, whether directly and/or indirectly, the Collateral Shares, or any proceeds therefrom; and

(c) a Stop Notice under Order 50 rule 1 of the Rules of Court has also been granted and notifications has been sent to America 2030, its agents and other financial institutions dealing with securities in Singapore that hold the shares of the Company in custody in order to allow the receipt of a warning should there be any attempt to transfer or dispose of the Collateral Shares.

## 4.   CONCLUSION

4.1   Save for the Collateral Shares disclosed above, Mr Guo and Mr Ma have represented to the Company that none of the other shares that each of them holds in the Company (direct and indirect) have been pledged or encumbered in any way.

4.2   The Company wishes to reiterate its position contained in the announcement made on 1 November 2018 that it is unaware of any changes in policy, regulation or business performance that could have caused the volatility of the Company's share price. The Company remains fully operational and dedicated to executing the Green Investments (GI) growth strategy, which the Board believes has the potential to improve Shareholders' value in the long term.

4.3   The Company will make appropriate announcements as and when there are material developments in relation thereof. Shareholders are advised to read this announcement and any further announcements by the Company carefully. Shareholders are advised to refrain from taking any action in respect of their securities in the Company which may be prejudicial to their interests, and to exercise caution when dealing in the securities of the Company. In the event of any doubt, Shareholders should consult their stockbrokers, bank managers, solicitors, accountants or other professional advisers.

BY ORDER OF THE BOARD

Chin Sek Peng
Independent Director
8 November 2018

2

# EXHIBIT F



## SUNPOWER GROUP LTD.

**RESPONSE TO QUERIES FROM SINGAPORE EXCHANGE SECURITIES TRADING LIMITED ON THE ANNOUNCEMENT IN RELATION TO NOTICE OF LEGAL ACTION BY CERTAIN SUBSTANTIAL SHAREHOLDERS OF THE COMPANY AGAINST AMERICA 2030 CAPITAL LIMITED REGARDING COLLATERAL SHARES**

*Unless otherwise defined, capitalised terms used in this announcement shall bear the same meaning as ascribed to them in the announcement of Sunpower Group Ltd. ("Company") on 8 November 2018 in relation to the notice of legal action by certain substantial shareholders of the Company against America 2030 Capital Limited regarding collateral shares ("8 November 2018 Announcement").*

In response to the queries raised by the Singapore Exchange Securities Trading Limited ("SGX-ST"), the board of Directors (the "Board") of Sunpower Group Ltd. (the "Company") wish to provide the following information:

**Question 1:**

**Whether there is any borrowing or loan of the Company or its subsidiaries that contains any provisions which makes references to the shareholding interests of Mr Guo Hongxin and Mr Ma Ming in the Company or places restrictions on any change in control of the Company.**

**Our Response:**

Insofar as the existing borrowings or loans of the Company and its subsidiaries (collectively, the "Group") are concerned, only the CBs (as defined below) contain specific provisions that make reference to the shareholding interests of Mr Guo Hongxin ("Mr Guo") and Mr Ma Ming ("Mr Ma") in the Company or places restrictions on any change in control of the Company.

The Company has issued convertible bonds due 2022 of an aggregate principal amount of US$110 million to Glory Sky Vision Limited ("GSV") ("Tranche 1 Convertible Bonds"). In addition, Blue Starry Energy Limited ("BSE") and GSV have also agreed to subscribe for convertible bonds due 2022 of an aggregate principal amount of up to US$70 million ("Tranche 2 Convertible Bonds", together with the Tranche 1 Convertible Bonds, the "CBs") and the Company has issued US$20 million Tranche 2 Convertible Bonds to BSE and GSV.

Under the agreements relating to the CBs ("CB Agreements"), each of Mr Guo and Mr Ma had provided irrevocable undertakings to GSV and BSE, *inter alia*, not to dispose of certain percentage of their interests in the shares of the Company.

**Question 2:**

**Board's confirmation as to whether the Company is in compliance with Listing Rule 704(31) relating to Loan Agreements.**

**Our Response:**

As mentioned in the response to Question 1 above, insofar as the existing borrowings and loans of the Group are concerned in respect of the requirement under Listing Rule 704(31), relevant

**SUNPOWER GROUP LTD.**
Page 2

announcements in relation to the CBs have been made. Please refer to the Company's announcements on 14 December 2016, 9 February 2017, 13 February 2017 and 3 March 2017, and the Company's circular to shareholders dated 13 February 2017 relating to, *inter alia*, the Tranche 1 Convertible Bonds and the Company's announcements dated 22 May 2018, 16 August 2018, 21 August 2018 and 15 October 2018, and the Company's circular to shareholders dated 21 August 2018 relating to, *inter alia*, the Tranche 2 Convertible Bonds.

As mentioned in the 8 November 2018 Announcement, the loan agreement was entered into between the Lender, Mr Guo and Mr Ma (in their personal capacities), through their respective wholly-owned subsidiaries ("Borrowers", each a "Borrower"), pursuant to which the Lender is to extend a loan to each Borrower for their personal use ("America 2030 Loan Agreement"). None of the Company or its subsidiaries is a party to the America 2030 Loan Agreement. Accordingly, Listing Rule 704(31) is not applicable to the Group in respect of the America 2030 Loan Agreement.

Question 3:

**Whether the Company had obtained undertaking from Mr Guo Hongxin and Mr Ma Ming to notify the Company of any share pledging arrangements relating to their shareholdings in the Company and any other event which may result in a breach of the Company's loan provisions pursuant to Listing Rule 728 in relation to Share Pledging Arrangements, if applicable. Where not applicable, please provide an explanation.**

Our Response:

The Company has obtained undertakings from Mr Guo and Mr Ma pursuant to Listing Rule 728 in respect of the CBs.

Question 4:

**Board's confirmation as to whether the Group is in compliance with Listing Rule 728.**

Our Response:

The Board refers to the response to Question 3 above and confirms that the Group is in compliance with Listing Rule 728.

Question 5:

**Board's confirmation as to whether the Group is in compliance with Listing Rule 704(22) in relation to disclosure of any breach of any loan covenant which, in the opinion of the Company's directors which would result in the Company facing a cash flow problem.**

Our Response:

For the reasons set out in the response to Question 6 below, the Board confirms that the Group is in compliance with Listing Rule 704(22), as there is no breach of any loan covenants or notices received by the Group to demand repayment of loans granted to the Group.

Question 6:

**Whether the Company is in breach of any of the Company's or its subsidiaries' loan provisions in view of the unauthorized transfers of shares in relation to the Loan Agreement entered into between two substantial shareholders of the Company and America 2030 Capital Limited.**

**SUNPOWER GROUP LTD.**
Page 3

## Our Response:

The Group is not in breach of any of the Group's loan provisions in view of the unauthorised transfers of shares in relation to the America 2030 Loan Agreement.

As referred to in our response to Question 1, only the CB Agreements, being loans taken out by the Group, contain specific provisions that make reference to the shareholding interests of Mr Guo and Mr Ma. Under the CB Agreements, it is a requirement that, *inter alia*, unless and until outstanding CBs have fallen below 5%, Mr Guo and Mr Ma shall not dispose of more than 20% of their combined holdings in the shares of the Company as at the date of the purchase agreement in respect of Tranche 2 Convertible Bonds. The Company understands that the shares of Mr Guo and Mr Ma (of approximately 1.89% of the total issued share capital of the Company, each), which have been transferred without authority, is less than the percentage as stipulated in the foregoing restriction.

In addition, there are also no specific restrictions under the CB Agreements imposed on Mr Guo and Mr Ma in respect of any pledge of or any other security over the shares granted by Mr Guo and Mr Ma. Accordingly, the shares that Mr Guo and Mr Ma (of approximately 1.89% of the total issued share capital of the Company, each) was each supposed to pledge as collateral pursuant to the America 2030 Loan Agreement was not in breach of the provisions in the CB Agreements.

## Question 7:

**Board's opinion as to whether the Group is able to continue as a going concern and the bases for such an opinion.**

## Our Response:

As mentioned in the responses above, the Group is not a party to the America 2030 Loan Agreement. The America 2030 Loan Agreement constitutes borrowings of the Group's substantial shareholders and do not, in any way, constitute borrowings of the Group.

Given the foregoing, as well as the response to Question 6 above that the Group is not in breach of any of the terms of its borrowings in view of the transfers of shares in relation to the America 2030 Loan Agreement, the Board is of the opinion that, the America 2030 Loan Agreement does not have any bearing on the Group's borrowings and the Group is therefore able to continue as a going concern.

By order of the Board

Yang Zheng

Independent Director

20 November 2018

# EXHIBIT G

# Sunpower says illegal transfer out of 28 mil shares reason for trading halt



SINGAPORE (Nov 9): Sunpower Group, the China-based manufacture of energy saving and environmental protection products, has finally revealed the reason for calling a trading halt on Monday.

In a Thursday night filing, Sunpower says the move followed the alleged illegal transfer of a total of 28 million shares belonging to executive chairman Guo Hongxin and executive director Ma Ming out of a designated account.

On Oct 17, Guo and Ma, through their respective subsidiaries, had entered into a personal loan agreement with lender America 2030 Capital. As collateral, Guo and Ma had provided 14 million Sunpower shares each -- representing a total 3.78% stake in the company -- as collateral.

Guo holds 147.7 million shares or a 19.98% stake in Sunpower while Ma holds 128.5 million shares or a 17.39% stake.

"The loan, which has not been disbursed to the borrowers, is for the borrowers' personal use, and the borrowers would be seeking legal advice and intend to commence legal proceedings against the lender in respect of the collateral shares," says Sunpower in its filing.

Upon receipt of the news, a trading halt was called by Sunpower on Monday to enable the company to disclose material information and minimise the potential existence of a disorderly market.

Sunpower adds that the Supreme Court of Singapore on Thursday had granted an order to restrain America 2030 and related parties from selling the shares and benefit from proceeds resulting from the sale.

Shares in Sunpower had traded at 39 cents before the halt.

# EXHIBIT H

# Sunpower executives involved in illegal transfer of shares lodge report with CAD



SINGAPORE (Dec 5): Sunpower Group's executive chairman Guo Hongxing and executive director Ma Ming have approached and lodged a report with the Commercial Affairs Department (CAD) and issued a press release regarding their involvement with the illegal transfer of 28 million shares in the group.

To recap, Guo and Ma, both substantial shareholders of Sunpower, had entered into a personal loan agreement with lender America 2030 Capital while providing 14 million Sunpower shares each – representing a total 3.78% stake in the company – as collateral.

Both executives have now obtained an ex parte interim injunction to restrain the lender and related parties from selling these shares.

Sunpower called for a trading halt earlier in November to disclose the information upon receiving the news.

In Tuesday filing, the China-based manufacturer of energy-saving and environmental protection products emphasises that the move was entirely on Guo and Ma's parts, and that their decision to lodge a report with the CAD was self-initiated and voluntary.

According to group, it is not involved in Guo and Ma's illegal trading of its shares, and therefore its business and operations are not affected in relation.

See: Sunpower says not in breach of any loan covenant; able to continue as going concern

"The company remains fully operational and dedicated to executing the Green Investments (GI) growth strategy, which the board believes has the potential to improve Shareholders' value in the long term," adds Sunpower.

Shares in the group closed 2.5 cents lower at 34 cents on Tuesday.